**John DOE No. 1, John Does Nos. 3 and 4, John Doe Nos. 6 Through 8 and National Day Laborer Organizing Network, Plaintiffs,**

v.

**VILLAGE OF MAMARONECK, Phillip Trifiletti, as Mayor of the Village of Mamaroneck, Edward Flynn, as Chief of Police of the Village of Mamaroneck, Defendants.**

**No. 06 CIV. 3243(CM)(MDF).**

United States District Court, S.D. New York.

Nov. 20, 2006.

Lino John Sciarretta, Thacher Profitt and Wood LLP, New York, NY, for Defendants.

MCMAHON, District Judge.

The court, for its findings of fact, conclusions of law and verdict:[1]

## FINDINGS OF FACT

### I. THE PARTIES

#### A. Plaintiffs

1. Plaintiff John Doe No. 1 is a 27 year-old male of Guatemalan descent, who has resided in the Village of Mamaroneck recurrently for four and a half years. (Doe No. 1 ¶ 1.)

2. Plaintiff John Doe No. 3 is a 24 year-old male of Guatemalan descent, who has resided in the Village of Mamaroneck since February 2006. (Doe No. 3 ¶ 1.)

3. Plaintiff John Doe No. 4 is a 34 year-old male of Guatemalan descent, who has resided in the Village of Mamaroneck for five and a half years. (Doe No. 4 ¶ 1.)

4. Plaintiff John Doe No. 6 is a 36 year-old male of Mexican descent, who has resided recurrently in the Village of Mamaroneck for eight years. (Doe No. 6 ¶ 2.)

5. Plaintiff John Doe No. 7 is a 40 year-old male of Guatemalan descent, who has resided in the Village of Mamaroneck for fourteen years. (Doe No. 7 ¶ 2.)

6. Plaintiff John Doe No. 8 is a 42 year-old male of Salvadorian descent, who has resided in the Village of Mamaroneck for thirteen years. (Doe No. 8 ¶ 3.)

7. Plaintiff National Day Laborer Organizing Network ("NDLON") is an unincorporated not-for-profit organization that provides advocacy on behalf of, and assistance to, day laborers across the United States, including those in Mamaroneck. (Newman ¶ 4; T. 197:4–8 (Newman)).

8. The aims of NDLON include working for the repeal or invalidation of laws that restrict the right of day laborers to solicit employment. (PX 102.)

9. NDLON's resources are expended on its mission of assisting day laborers. (TT p. 196.)

10. NDLON has been a plaintiff in at least two other federal litigations in which its resources have been expended in furtherance of litigation (TT pp. 97–98.)

11. At the time that this lawsuit was commenced, NDLON had 5 employees, including Mr. Chris Newman ("Mr. Newman"), whose position is Legal Programs Coordinator. (TT p. 194.)

12. The resources utilized by NDLON in this case were time and expenses for both Mr. Newman and Mr. Fernando Pacheco (NDLON's East Coast Coordinator) to travel to the Village to meet with day laborers to discuss day laborer issues in the Village, including this lawsuit. (TT p. 200.)

13. NDLON came to the Village in connection with the de-designation of the Parking Lot Site. (TT pp. 204–205.)

---

1. Citations to the record will be made using the following notations: trial transcript (T. ___); witness statements (Last Name of witness followed by paragraph number); Plaintiffs' trial exhibits (PX___); Defendants' trial exhibits (DX___).

14. Mr. Newman met with the day laborers three or four times after the Parking Lot Site was de-designated. (TT p. 200.)

15. NDLON is being legally represented without charge. (TT p. 203.)

16. NDLON has no individual members. (TT p. 194.) NDLON's membership is comprised solely of organizations. (TT p. 194.)

17. The record does not show who, if any, the organizational members of NDLON are.

18. The individual day laborer plaintiffs, John Does 1, 3, 4, 6, 7 and 8, are not members of NDLON. (TT p. 195.)

19. NDLON has not devoted resources to address the day laborer situation in Mamaroneck above and beyond what it would have in the ordinary course of business.

20. The claims of John Does 2 and 5 have been withdrawn.

**B. Defendants**

21. Defendant Village of Mamaroneck (the "Village") is a New York municipal corporation, located within Westchester County, New York.

22. The Village is governed by a five-member Board of Trustees. The Board of Trustees consists of the Mayor of the Village, Defendant Philip Trifiletti, Joseph Angilletta, William Paonessa, Tony Vozza and Thomas Murphy.

23. By Village ordinance, each of the members of the Board of Trustees is also a Police Commissioner.

24. Defendant Philip Trifiletti is the Mayor of the Village of Mamaroneck and a member of the Board of Trustees. He is the Village Official charged with overall responsibility for implementing and administering the policies of the Village of Mamaroneck.

25. The Mayor gives directions to the Village Chief of Police regarding, among other things, concentrations of police activity. (DX 40.)

26. Defendant Edward Flynn is the Chief of the Village of Mamaroneck Police Department. He is responsible for implementing and administering the policies of the Village Police Department.

27. At all times relevant to this action, Defendants were acting under color of law.

**II. BACKGROUND**

28. For half a century or more, immigrants—who typically numbered from 20 to 30 (T. 687:24–688:7, 721:2–20 (Trifiletti); PX94a)—have gathered on a daily basis in the Columbus Park area of the Village for the purpose of soliciting employment. (T. 687:12–15 (Trifiletti), 631:6–14 (Angilletta)).[2]

29. Columbus Park, a public park adjacent to the Mamaroneck train station, is located in an area of the Village of Mamaroneck known as Washingtonville. Washingtonville contains businesses and residences and is a dense and active neighborhood. It is also a very diverse neighborhood, with a large Latino population, as well as Chinese, Italian, Irish, African American and Caucasian residents (Tr. 40–41, 583, 663, 750, 752, 807; DX 111, 115, 121.)

30. Before the early 1990s, those seeking employment were predominantly white. (T. 631:15–20 (Angilletta), 687:20–23 (Trifiletti)).

31. Today, those seeking employment (hereinafter the "day laborers") are almost exclusively Latino. (T. 16:1–3 (Viera),

---

2. Columbus Park is adjacent to the Washingtonville area of Mamaroneck (PX 15; T.

13:12–18, 36:22–25 (Viera), 811:21–812:14 (Gitlitz); Fava ¶ 9).

95:19–96:1 (Rolon), 178:16–18 (Candamil), 329:6–9 (Lopez), 432:22–433:3 (Flynn), 687:16–19 (Trifiletti); Doe No. 1 ¶¶ 9–10, Doe No. 6 ¶¶ 17, Rolon ¶ 5.)

32. Village officials do not know whether or not the day laborers are immigrants and do not know their immigration status. (T. 433:4–11 (Flynn)).

33. Throughout the 1990s and early 2000s, Latino day laborers gathered in the Village's historic immigrant-assembly area, which was located on Van Ranst Place (which borders Columbus Park). There, they obtained work from contractors and other employers on a regular basis. (T. 15:18–24 (Viera), 692:11–17 (Trifiletti); 782:14–15 (Gitlitz); *see* PX15.)

34. In the two years immediately preceding August 2004, the number of day laborers seeking work within the Village ranged, on average, from 60 to 80. (T. 15:21–24 (Viera), 784:18–21 (Gitlitz), 434:2–9 (Flynn)).

35. Despite their increased numbers compared to their non-Latino predecessors, the actions of Latino day laborers prior to 2004 were monitored by no more than a routine police presence. (T. 20:1–4 (Viera), 436:7–12 (Flynn), 785:23–786:8 (Gitlitz)).

36. During this time, an average of approximately 12 to 15 contractors per day would stop to pick up workers as they gathered on Van Ranst Place. (T. 20:5–15, 785:11–13 (Gitlitz)). This occurred between the hours of 7 A.M. and 11 A.M.

## III. AUGUST 2004: THE DAY LABORERS ARE MOVED FROM VAN RANST PLACE TO THE PARKING LOT AND THE VILLAGE LAUNCHES AN INTENSE LAW ENFORCEMENT CAMPAIGN *DESIGNED TO REDUCE THE NUMBER OF WORKERS*

37. By way of background, plaintiffs allege that Village officials began a "campaign of harassment and intimidation" against the day laborers in response to pressure from Park View Condominiums, the developer of a luxury condominium across the street from the day laborer site. (Second Amended Cplt. ¶ 34.) The parties have stipulated that in January 2006 construction did begin on a new luxury condominium building across the street. (*Id.* ¶ 31; Second Amended Answer ¶ 31.) Further, plaintiffs allege and defendants concede that John Lese, an agent for the developer, wrote several letters to Village trustees and/or its attorneys prior to the commencement of the construction. (Second Amended Cplt. ¶ 32; Second Amended Answer ¶ 32.) However, since plaintiffs have not submitted the letters into evidence, and there is no other evidence of either their content or the dates on which they were sent in the record, this court cannot conclude, as plaintiffs allege, that Village officials were under pressure from the developer in or about August 2004, when the activity that forms the basis of this lawsuit began.

38. Village officials unilaterally determined, in August 2004, that the day laborers would no longer be permitted to gather on Van Ranst Place. Instead, the workers were directed to gather in a commuter parking lot at the northwest corner of Columbus Park, where Van Ranst intersects with Jefferson Avenue (hereinafter, the "Site"). (T. 23:10–13, 25:16–19 (Viera); 442:11–15 (Flynn); Doe No. 7 ¶ 4; DX80.) A sign was posted at the Site, which read "Pick–Up Location Day Laborers," and first one, and then a second, entrance/driveway were added to the parking lot (with the approval of the Village Traffic Commission, the Mayor and the Board) to accommodate this use of the Site. (Tr. 576–77, PX 95.)

39. In late August and early September 2004, the Mayor began making public

statements (a) decrying the number of day laborers in Mamaroneck, suggesting that their numbers had grown to 200 to 225, and (b) claiming that the great majority of these workers were not residents of the Village. (T. 690:20–25 (Trifiletti); DX67; PX94a.)

40. The mayor had no factual basis for making either of these assertions.

41. Police Chief Flynn estimated that the number of day laborers gathering at this time on Van Ranst Place—the predominant gathering place for day laborers prior to the establishment of the Site (*e.g.*, T. 782:12–15 (Gitlitz))—was less than half the number suggested by the Mayor. (T. 434:2–9, 436:7–12 (Flynn)).

42. The Mayor conceded that no study confirming the residency of the day laborers was done until May of 2006 (T. 689:24–690:9 (Trifiletti)). That study concluded that the great majority of day laborers in the Spring of 2006 were Village residents. (PX 74.)

43. For 15 months of the Site's operation, the Hispanic Resource Center employed a site coordinator, Janet Rolon, who was present at the site on a daily basis, and kept notes of each day's activities. (Rolon ¶¶ 2–3.) Ms. Rolon's records are the only contemporaneous records reflecting the daily activity of the day laborers since November 2004. (Tr. 69–70, 813, PX 101.) They do not show anything like 200–225 laborers appearing at the Site on any given day. In fact, during the entire period when she kept records, the most day laborers who appeared at the Site on any given day was approximately 90. (PX 101.)

44. The Mayor's statements regarding the number and residency of the day laborers were designed to justify the law enforcement campaign that ensued.

45. Coincident with the opening of the Site, the Village established an unprece-dented police presence in the Columbus Park area and began to ticket commercial vehicles aggressively. (PX94a.)

46. The goal of this law enforcement campaign was to reduce the number of day laborers in the Village primarily by discouraging employers from picking them up. (T. 694:7–695:1, 708:23–709:7, 710:6–11 (Trifiletti); (PX70, PX94a)).

47. As part of this campaign, the police department, acting on instructions from the Mayor and the Board of Trustees (T. 27:17–24 (Viera)):

1 Stationed a police car at each end of Van Ranst, and one at Sheldrake and Van Ranst. (T. 23:17–24:5 (Viera); 787:18–23 (Gitlitz)).

2 Assigned numerous officers to the area, which initially required overtime work. (DX 67 at MK228; PX94a).

3 Began treating the workers at the parking lot in a manner that made them feel tense and angry and agitated and as if they were criminals. (T.788:8 (Gitlitz); T.25:7–1(Viera)).

4 Began taking action designed to scare off potential employers, including, aggressively ticketing contractors who entered the area to pick up day laborers. (T. 788:3–8 (Gitlitz)); (T.26:6–9(Viera)).

48. During the first two weeks following the opening of the Site, 104 traffic citations were issued in the Columbus Park area, an unusually large number for that area. (T. 708:5–10 (Trifiletti); DX80.)

49. In the next two weeks, approximately 100 additional tickets were issued in the Columbus Park area. (DX 67; T. 707:24–708:10 (Trifiletti)).

50. Witnesses who visited the site during the first week of its operation described the heavy police presence, the agitated state of the workers, and ticketing or absence of contractors. (T. 21:20–28:8 (Viera); 787:18–789:17 (Gitlitz)).

51. In less than one month the number of day laborers in Mamaroneck fell to approximately 30 to 40. (T. 699:12–15 (Trifiletti); DX67.)

52. The Mayor subsequently boasted, "We no longer have a [day laborer problem.]" (DX 67.)

53. The goal of the Village's campaign of targeted law enforcement—to drive away the day laborers—was defended by the Mayor some 17 months later in a televised address, when he described how the Village had diminished the number of day laborers:

> I think that's important that everyone understands that if I go back to about 16–18 months ago, we in the Village of Mamaroneck had an out of control problem in the Village where we had a vast number of laborers coming to our village seeking employment. We estimate the number to be somewhere around 220, and these laborers were in and around Columbus Park and what we found was that the majority of the laborers coming to our village, probably in excess of 90% were actually from out of town. . . . So I met with the Police Chief and we put a plan in place where we started enforcing everyday laws, that get enforced in our village everywhere, throughout our village, not just at the park, and we put 5 police officers in and around the park enforcing the laws of the village. The numbers dwindled over about a 6 month period from about 220 down to about 25 . . . .

(PX94a.)

## IV. INTENSIVE LAW ENFORCEMENT ACTIVITIES CONTINUE DURING THE SEVENTEEN–MONTH PERIOD THAT THE WORKERS GATHER *IN THE PARKING LOT AT COLUMBUS PARK*

54. For virtually every day of the next 17 months, until the parking lot was closed as a pick-up site, at least one patrol car was permanently stationed at the parking lot during almost every hour that workers were gathered there. (T. 28:11–22 (Viera); 325:8–10 (Lopez); 407:7–20 (Gaffney); 443:1–3 (Flynn); 790:2–5, 790:23–791:8, 793:3–8 (Gitlitz); Rolon ¶ 9.)

55. The police detail at the parking lot of Columbus Park ended each day at approximately 11 A.M. (T. 443:6–28 (Flynn))—by which time those day laborers who were going to find work had found it. There was no police presence at the parking lot on Sundays. (T. 443:1–5 (Flynn)). The 7 a.m. to 11 a.m. police post was described in some of the police log sheets as the "day laborer detail." (PX 111.)

56. The police detail at the parking lot ended almost as soon as the day laborers moved primarily to Mamaroneck Avenue in March of 2006. (T. 793:15–794:1 (Gitlitz); PX85 JD0560.)

57. No other police vehicle had ever before been permanently stationed at one location in the Village—even in Washingtonville. (T. 408:19–409:5 (Gaffney), 443:12–15 (Flynn)).

58. Indeed, with the exception of heavy-traffic areas where a police officer was needed to direct traffic, there was no other place in the Village during this time period where a police vehicle was stationed for any sustained period of time. (T. 30:13–25 (Viera); 408:18–409:5 (Gaffney); 443:12–444:16 (Flynn); 715:11–716:14 (Trifiletti)).

59. The area close to the train station is not lightly traveled, and there is considerable vehicular and pedestrian traffic, especially during regular commutation hours. However, the officer in the vehicle that remained at the parking lot on a daily

basis did not direct traffic. (T.791:11–20 (Gitlitz))

60. Frequently, the one permanent car stationed at the Site was joined by one or two other police vehicles, and sometimes by an officer on bike patrol. (PX 17; PX 19; T. 714:21–715:4 (Trifiletti)).

61. During the 17–month period that the Site was open, the Village police department was severely short-staffed. (T. 409:6–9 (Gaffney); DX 32–33.)

62. Because of the under-staffing, the police department was not able to station a patrol car at the basketball court where more than a hundred people regularly gather and where fights have occurred in the past. (T. 409:10–410:19 (Gaffney); DX32–33.)

63. The police officer assigned to the site was directed to strictly enforce violations by contractors picking up day laborers. (PX 19; PX 111.)

64. During this time period, numerous traffic citations were issued to contractors, sometimes for nothing more than stopping to pick up a day laborer. (T. 279:2–5 (E.Garcia); 603:9–13; Rolon ¶ 10; *E.g.*, PX8–10.)

65. This and similar behavior was designed to and did discourage contractors from stopping to pick up workers. (Rolon ¶¶ 10–16; Doe No. 1 ¶ 4–13; Doe No. 8 ¶¶ 8–9.)

66. Some contractors who attempted to enter the Site to hire day laborers during this time would, after speaking with the police officers stationed there, simply drive away without hiring anyone. (T. 26:6–8, 62:2–9 (Viera); Rolon ¶¶ 10, 12–13.)

67. The constant presence of the police car at the Site was intimidating to the workers and contractors (Rolon ¶ 9; T. 792:15–21 (Gitlitz)), and it affected the ability of day laborers to obtain work. (Doe No. 1 ¶ 4–5; Doe No. 8 ¶ 16; Doe No. 7 ¶ 6.)

68. Village police did not enforce with equal rigor, and sometimes even ignored, traffic and parking infractions that occurred in other parts of the Village or that were committed by persons other than contractors. (T. 31:1–19 (Viera); Rolon ¶¶ 29–10.) One store owner has observed Latino drivers being ticketed outside his store for not wearing a seatbelt; but when police officers saw white drivers not wearing their seatbelts, they made a gesture to show that the drivers should buckle their seatbelts but did not give these drivers a ticket. (T. 151:9–24 (Zuniga)).

69. During the time the site was open, the police engaged in abusive and intimidating behavior toward plaintiffs and other day laborers. (T. 107:3–6 (Rolon); Rolon ¶¶ 9, 15, 18.)

70. Village officials, including the Police Chief and the Mayor, were repeatedly advised during the 17–month period that the extensive police presence at the site, including the presence of the police car, was intimidating. (T. 408:5–18 (Gaffney); 445:24–447:4 (Flynn); 717:4–19 (Trifiletti); 792:15–21 (Gitlitz); DX84; DX86 at MK00189; DX88 at MK00140.)

71. Chief Flynn advised representatives of the Hispanic Resource Center that the police would remain at the parking lot until the Village Board of Trustees directed their removal. (T. 27:17–24 (Viera); 789:3–6 (Gitlitz)).

72. According to Ms. Rolon's records (kept from November 1, 2004 through February 1, 2006) (a) the average number of workers at the site each day ranged from 52 during the high season to 22 during slower seasons. (PX83 at JD0228); (b) the average number of workers picked up each day ranged from 5 to 9 during high seasons to 1 to 4 during slower seasons,

with a daily average over this fifteen month period of 3.8 workers (PX83 at JD0228, PX84 at JD0565); and (c) the average number of employers picking up workers each day over this fifteen month period was 3.4 employers (PX83 at JD0228, PX84 at JD0565).

73. By contrast, during this same time period approximately 25–30 children were being dropped off every morning between 6:30 and 8:30 at Nana's Kids, a nearby daycare center. (T. 548:18–19, 549:7–8 (Nigro)). There is no evidence that anyone dropping off children was ticketed or intimidated.

## V. THE VILLAGE'S PURPORTED CONCERN ABOUT CRIME AND "QUALITY OF LIFE ISSUES" IN THE COLUMBUS PARK AREA

74. The Village's purported justification for the increased and unprecedented police presence in around the Site during the morning hours is that there had been a sudden up-swing in so-called "quality of life" issues—such as prostitution, drug-dealing, public intoxication, urination and defecation (T. 482:19–483:17 (Ferraro))—and criminal activity.

75. However, "the so-called quality of life issues that existed in [this] area around this time did not relate to day laborers or the day laborer site at Columbus Park." (T. 485:5–9 (Ferraro)).

76. The records of the Police Department do not reflect any complaints about criminal activities by day laborers. (T. 477:15–19 (Flynn)).

77. Any complaints to the Village police department concerning any incidents of public urination or defecation, disorderly conduct, indecent exposure, etc. would have been recorded in the Village Police Department Desk Officer Log. (T. 417:5–419:9 (Gaffney)).

78. According to the Desk Officer Log, between January 1, 2006 and June 30, 2006, the Village received only one complaint of public urination, and that one incident occurred—at night—five blocks from Columbus Park. (PX33 at MK01880; T. 418:10–419:3 (Gaffney)).

79. The only arrests during that six month period that could even conceivably have involved a day laborer—*i.e.,* that occurred in and around Columbus Park between the hours of 6:30 and 11:30 a.m. and involved suspects with Hispanic surnames—were (a) one arrest for "Exposure" (PX 33 at MK 2924), and (b) one arrest for possession of marijuana (DX 98).

80. Ms. Rolon, the Site coordinator from November 2004 through February 2006, "never [saw] a day laborer urinate or defecate in public, engage in public intoxication, or harass any passersby in the area." (Rolon ¶ 6.)

81. During the time the Site was open, families continued to use the park and the day laborers did not interfere with them. (T. 16:8–17:14 (Viera); 783:17–24 (Gitlitz)).

82. At times, day laborers may have approached SUVs driven by village residents in the mistaken belief that they were occupied by contractors. (T. 542:6–23 (Nask)). However, there is no evidence that any criminal activity occurred.

83. Tony Fava is the head of a group known as the Washingtonville Neighborhood Association. (DX85–88.)

84. Mr. Fava testified that the "biggest problem" in the Washingtonville neighborhood was gangs, and that other problems included crimes such as prostitution, drug sales, stabbings, assaults and burglaries. (T. 595:19–596:16 (Fava)).

85. There is no evidence in this record or in the records of the Police Department

that were produced at trial linking any of this activity to day laborers.

86. Mr. Fava testified that these types of criminal activity were concentrated not just at Columbus Park but also at Pape's Park and the intersection of Madison Street and Old White Plains Road. (T. 595:8–13, 598:25–599:12 (Fava)).

87. Although the Mayor testified at trial that he had received numerous complaints from neighborhood residents concerning incidents urination, defecation, drug use, littering and increased traffic, his contemporaneous public comments were otherwise. From the time the Site opened in August of 2004 until September of 2005, the Mayor repeatedly stated that he had not received any complaints about the day laborers in Columbus Park from residents or police, and expressed satisfaction with the way the site was operating. (DX 84 at JD0001, DX 86 at MK00189, DX 87 at MK00246).

88. Although Chief Flynn and his Executive Lieutenant, James Gaffney, testified at trial that the Village had received numerous, often repeated, complaints about the conduct of the day laborers, the Police Department Log reflects very few such complaints. At a January 2006 meeting of a task force created to address issues relating to day laborers (the "Day Laborer Task Force"), Sgt. Ferraro reported that, despite claims of increased numbers of laborers at the Site, "there had not been more problems." (DX 88.)

89. To the extent Village officials did receive complaints from residents concerning the behavior of the day laborers, the Village took no steps to investigate and determine whether those complaints were genuine and/or whether they were motivated, consciously or unconsciously, by racial animus towards the day laborers. (T. 728:19–22 (Trifiletti), 466:1–6 (Flynn)).

## VI. THE VILLAGE CLOSES THE DAY LABORER SITE IN THE *COLUMBUS PARK PARKING LOT*

90. In or about December 2005, a day laborer hiring site in New Rochelle closed for the winter months.

91. Janet Rolon's records (the only source of hard information) show that the number of day laborers coming to the Site increased from an average of 25 laborers in November 2005 to an average of 27 day laborers in December 2005 and an average of 39 in January, 2006. Rolon's records show that the largest number of day laborers who came to the Site after the closure of the New Rochelle site was 39. (PX83 at JD0228; PX84 at JD0565).

92. At a January 23, 2006 Board of Trustees meeting, Trustee Joseph Angilletta proposed that the Columbus Park day laborer hiring site be closed down. (DX56–57; T. 634:2–4 (Angilletta)).

93. Trustee Angilletta's stated reasons for proposing that the Site be closed were (a) there had been an increase in the number of day laborers using the Site, and (b) that the majority of the workers at the Site were now non-residents who were coming to the Village as a result of the closure of a day laborer hiring site in neighboring New Rochelle. (DX55–56; T. 632:13–634:17 (Angilletta)).

94. Village officials were aware that the New Rochelle site had closed for the season and would reopen in March. (T. 675:15–19 (Murphy); PX5 at MK00456).

95. Trustee Angilletta's claims regarding the number and residency of the day laborers at the Site were based solely on statements that were made to him by Tony Fava. (T. 632:25–634:8 (Angilletta); DX 56.)

96. Mr. Fava has been and remains a vocal opponent of the presence of day laborers in and around the Columbus Park areas (DX88 at MK00141; PX98; PX99; T. 563:20–565:1 (Fava); 419:23–420:1 (Gaffney)).

97. Mr. Fava attended several meetings of the Day Laborer Task Force. At one meeting, held on January 19, 2006, he (a) warned members of the task force about the "serious penalties against knowingly employing illegal immigrants and helping them in certain other ways" (T. 563:20–565:1 (Fava); PX 22), and (b) expressed concern that the day laborers in Columbus Park "could be sex offenders," and that this might violate a recently enacted state law (T. 565:2–566:16 (Fava); PX22).

98. There is no evidence that any day laborer is or ever was a sex offender.

99. Almost every morning between mid-December 2005 and January 7, 2006, Mr. Fava took photographs of the day laborers at the parking lot in Columbus Park, ostensibly for the purpose of creating an accurate record of the number of workers utilizing the area. (T. 561:23–562:22, 578:12–579:18 (Fava); PX 98).

100. Mr. Fava's photographs show between eight and twenty-four laborers seeking work in the parking lot on any given day. (DX 101.)

101. As noted above, the Hispanic Resource Center's records indicate that the number of day laborers gathering in the parking lot to seek work during November and December 2005 was at a seasonal low, with an average of 25 laborers using the parking lot each day in November and 27 using it each day in December. These numbers are nearly identical to the prior winter's averages of 28 laborers using the parking lot each day in November 2004

and 24 day laborers using it each day in December 2004. (PX83 at JD0228.)

102. The Hispanic Resource Center's records indicate that the number of day laborers utilizing the site each day began to increase in January 2006—just as it had in January 2005—to an average daily number of 39 laborers, with a high of 62 day laborers. (PX84 at JD0565, PX83 at JD0228). This, of course, is well below the numbers being bandied by Mr. Fava, Mayor Trifiletti and Trustee Angilletta.

103. Ms. Rolon, the Hispanic Resource Center's Site coordinator, determined that the majority of day laborers utilizing the site were residents of Mamaroneck. (T. 118:5–12 (Rolon); Rolon ¶ 22.)

104. The resolution to close the parking lot as a day laborer hiring site was not on the agenda for the Board of Trustees Meeting on January 23, 2006. (T. 675:20–676:1 (Murphy)).

105. It was unusual for the Board of Trustees to vote on a resolution that had not been placed on the agenda. (T. 675:20–676:23 (Murphy)).

106. At the meeting, Trustee Thomas Murphy questioned the legality of the proposed resolution, and testified that he believed that the better course of action would have been to put it on the agenda for a subsequent meeting and allow for public comment. (T. 676:12–17 (Murphy)).

107. Representatives of the Hispanic Resource Center were not present at the January 23, 2006 meeting and were unaware of Trustee Angilletta's resolution. (DX56.)

108. By a vote of 3–2 the Village Board of Trustees passed a resolution stating:

RESOLVED, that the day laborer's site at Columbus Park be closed as of February 1, 2006 to April 1, 2006, and will remain closed until further notice, based upon the response and participation of

the Village of Mamaroneck's neighboring communities in opening up a day laborer hiring site (DX56 at p. 14). Mayor Trifiletti and Trustee Murphy voted against the resolution.

109. The intent and the effect of the resolution was that neither day laborers nor contractors would be able to use the parking lot as a day laborer pick up Site. (PX5, PX23, DX77, Rolon ¶ 23.)

110. The decision to close the Site was motivated by the uncorroborated complaints of residents of the Washingtonville community (like Fava) and businesspeople in the area (like Marni Ranani–Nigro).

111. Following the January 23, 2006 Board meeting, Trustee Angilletta made public comments comparing day laborers to "locusts," stating that they "are takers. They come in here and take, and they won't ever give back to the community." (T. 636:24–637:21 (Angilletta)).

112. Trustee Angilletta testified that his comments were directed at day laborers from outside the village, who were coming into the Village in larger numbers. However, the hard evidence—whether from Janet Rolon's notes or Tony Fava's photographs—does not bear out Angilletta's ex post facto contention that large numbers of day laborers were flocking to the Village from other municipalities; indeed, Rolon's numbers indicate that there were no more day laborers in Mamaroneck during December 2005 and January 2006 than there were in December 2004 and January 2005. Therefore, his testimony about the reason for and target of his remarks is not credible.

113. During the debate regarding whether to close the Site at Columbus Park, Trustee Paonessa complained that Westchester County was not helping the Village monetarily with a site nor were there sponsored sites in the Town of Mamaroneck or the Village of Larchmont. (PX5 at MK00457.)

114. Just a few weeks later, the County offered a site on County land in front of the County-owned Mamaroneck Waste Water Treatment Plant, and expressed willingness to work through any problems with the proposal. The County's proposed site was on West Boston Post Road (U.S. Route 1, a heavily-traveled road), at the entrance to Harbor Island Park. (Tr. 649–50, DX 75.) However, the Village rejected the offer by a vote of 4–1. (PX3–4, DX63.) The ostensible reasons for rejecting the County's proposal included concerns about the elimination of parking spaces and the fact that Harbor Island Park was used on weekend mornings by more than 700 children to play baseball, soccer and other sports. (Tr. 649–51, EDX 62, DX 76.)

## VII. A RESURGENCE OF LAW ENFORCEMENT ACTIVITY AFTER THE SITE IS CLOSED PREVENTS THE DAY LABORERS FROM *OBTAINING WORK*

115. In conjunction with the Board of Trustees resolution closing the Site, the Police Department issued an internal order to close the parking lot as a pick-up point and referred to the parking lot in a later order as "the closed Day Laborer site." (PX23, DX5.)

116. Although Lieutenant Gaffney, the author of the Police Department order, claimed that he did not actually believe that the Site would be closed to hiring, he did not communicate his purported belief to the officers assigned to the Site (T. 412:4–413:6 (Gaffney)). Instead, shortly after February 1, 2006, the Village posted three signs around Columbus Park stating "THIS IS NO LONGER A DAY LABORER HIRING SITE." (T. 33:10–21 (Viera);

413:14–414:9 (Gaffney); 448:25–450:7 (Flynn); PX91.)

117. The Village also stationed two police officers at the site, and police officers handed out flyers in Spanish to day laborers advising them that the Park was no longer a hiring site. (PX23; PX93; T. 488:6–9 (Ferraro)).

118. The police presence at Columbus Park and the posting of the signs was done at the direction of the Board of Trustees (T. 488:3–5 (Ferraro); DX 40).

119. Police Chief Flynn directly supervised the police initiative in Columbus Park during this period (T. 412:23–25 (Gaffney)).

120. On or immediately after February 1, 2006, the Village stationed police vehicles at either end of Van Ranst Place, sometimes with lights flashing. (T. 450:15–18 (Flynn); Rolon ¶ 26; Doe No. 3 ¶ 4.)

121. The number of day laborers utilizing Columbus Park decreased shortly after the Village closed the site. (T. 33:3–4, 61:13–15 (Viera); PX84 at JD0565; PX86 at JD0572.)

122. The day laborers first returned to the part of Van Ranst Place where they had gathered previously. (T. 33:22–25 (Viera); 450:10–12 (Flynn), 793:13–18 (Gitlitz); Rolon ¶ 24.)

123. However, Village police discouraged workers from seeking work not only at the parking lot but from anywhere along Van Ranst. (Rolon ¶¶ 27–28; Doe No.1 ¶¶ 10–11, Doe No. 6 ¶¶ 6–8, Doe No. 3 ¶ 6, Doe No. 8 ¶ 10.)

124. Examples include the following:

5 John Doe No. 8 was threatened with arrest if he remained in the area. (Doe No. 8 ¶ 10.)

6 John Doe No. 4 was threatened with a ticket if he did not move from the intersection of Van Ranst Place and Mamaroneck Avenue. He was also told that he could not be near Columbus Park nor on Mamaroneck Avenue because the area was no longer a place for day laborers to seek work. (Doe No. 4 ¶ 6.)

7 Some time after the incident described above, John Doe No. 4 was again threatened with a ticket if he did not move from the place he was drinking coffee, alone, on Mamaroneck Avenue. (Doe No. 4 ¶ 7.)

8 John Doe No. 3 was told to leave the area of Columbus Park because the owners of the construction site and the rest of the community did not want to see him in the Park anymore. (Doe No. 3 ¶ 6.)

125. Police officers at either end of Van Ranst Place discouraged contractors from driving down Van Ranst Place to pick up workers. (Doe No. 3 ¶ 5, Doe No. 1 ¶¶ 4, 7.)

126. Tony Fava, in addition to being the head of the Washingtonville Neighborhood Program, is also a Village Traffic Commissioner. (T. 568:16–18 (Fava)).

127. On February 8, 2006—one week following the closure of the Site—Mr. Fava made a motion to amend the Village traffic code by making Sheldrake Place, which leads onto Van Ranst Place, a "no-through trucks" street. Fava also seconded a motion designating most portions of Van Ranst Place as "no standing." (PX97 at MK06273, MK06277; T. 569:17–571:23 (Fava)).

128. The "source of complaint" listed on each of these motions was the Chief of Police. (PX97 at MK06270, MK06274.)

129. On March 13, 2006, the Village Board of Trustees passed a resolution adopting Mr. Fava's proposed change. (PX61 at pp. 11–12.)

130. Van Ranst Place was a "no-through trucks" street prior to March 2006, but the Village did not put up signs warning of this prohibition until after the hiring site was closed in 2006. (T. 416: 4–7 (Gaffney); 450:19–23 (Flynn); DX47 at MK06274, DX48; DX52.)

131. The Village's contention that these actions had nothing to do with the day laborers is not credible in view of the totality of the evidence.

132. Both Chief Flynn and Lieutenant Gaffney claim to have believed that putting up the signs would not prevent trucks from coming onto Van Ranst Place to pick up day laborers, but neither officer informed the officers assigned to the site that pick-ups were still permitted. (T. 416:4–417:4 (Gaffney), 451:18–452:1 (Flynn)).

133. Although Chief Flynn testified that he did not believe that the Board of Trustees' resolution prohibited contractor vehicles from stopping to pick up day laborers (T. 451:18–23 (Flynn)), he never advised police officers that that was the case (T. 451:24–452:1 (Flynn)). Instead, Chief Flynn specifically directed his subordinates that commercial vehicles that stop in Columbus Park—i.e. vehicles picking up day laborers—should be brought to the harbor and subjected to Department of Transportation safety inspections, which are extensive and time-consuming. (PX 69; (DX27)).

134. Prior to this, Chief Flynn had never provided direction as to where officers should find vehicles for safety inspections, nor had officers outside the traffic unit, such as Sgt. Ferraro, ever been involved in taking vehicles in for safety inspections. (T. 504:20–505:10 (Gerardi)).

135. Chief Flynn's ostensible reason for the order was that he had received complaints from the mayor and residents about commercial vehicles in unsafe conditions picking up day laborers. (T. 505:11–16 (Gerardi)). This is not credible.

136. The real reason for the order was to subject contractors picking up day laborers to harassment intended to keep them from picking up day laborers.

137. The effect of the resolution closing the site was immediate and dramatic. During the first 17 work days of January (January 2 through January 21), contractor(s) visited the site on 11 days. During the 44 work days from the resolution's passage until the workers moved to Mamaroneck Avenue (January 23 through March 15), contractor(s) only came to pick up workers on 6 days. (PX84 at JD0565; PX86 at JD0572; PX87 at JD0578.)

138. On or about March 14, 2006, Chief Flynn came to Van Ranst Place and said to representatives of the Hispanic Resource Center for the first time that workers would not get jobs there. (T. 795:1–14 (Gitlitz)).

139. Almost no contractors picked up day laborers on Van Ranst place for the six-week period that they remained on Van Ranst Place. (T. 34:8–10 (Viera); 794:23–25 (Gitlitz); Doe No. 3 ¶ 3.)

140. On March 14 or 15, the workers moved from Van Ranst Place to Mamaroneck Avenue. (Rolon ¶ 31; T. 796:18–797:3 (Gitlitz)).

## VIII. POLICE HARASSMENT OF WORKERS AND CONTRACTORS *FROM MID–MARCH 2006 TO THE PRESENT*

141. One or two days after the workers moved to Mamaroneck Ave., the police department used two traffic police on motorcycles to establish a checkpoint on Mamaroneck Ave. between Grand and Sheldrake, one of the major areas day laborers gathered. (T. 110:8–10 (Rolon); 505:17–507:18

**536**

(Gerardi); 797:8–18 (Gitlitz); Rolon ¶ 33; Doe No. 4 ¶ 13; PX71; PX72.)

142. The checkpoint remained in operation for over one month (T. 674:22–24 (Murphy); Rolon ¶ 33).

143. This was the first time that the police department had established a checkpoint in that vicinity (T. 508:16:–509:5 (Gerardi); 674:25–675:7 (Murphy); 799:3–12 (Gitlitz)).

144. Contractors' vehicles were stopped at the checkpoint. (T. 70:18–22 (Rolon); 673:6–21 (Murphy); PX70.) Indeed, as one member of the Village Board of Trustees described it:

> They chased the guys out of the park and now they are up and down Mamaroneck Avenue. The police have set up checkpoints at either end of Mamaroneck Avenue. There are four to six policemen there every morning, stopping every van and truck that goes through.

(T. 673:3–21 (Murphy); PX 70).

145. The checkpoint was intended to intimidate contractors and prevent them from picking up the day laborers gathered on Mamaroneck Avenue.

146. The police at the checkpoint for commercial vehicles typically issued citations for safety violations pursuant to portions of the Code of Federal Regulations adopted by the Village in Village Traffic Code sections 328.3 and 328.4. (T. 500:24–501:21 (Gerardi)).

147. Citations under these provisions of the Village Traffic Code appear in the Village's computer system with the violation description: "Motor Carrier Operates Vehicle in Violation of Safety Rules." (T. 501:22–502:23 (Gerardi)).

148. Citations for violations of traffic code 328.3 and 328.4 issued between 7 A.M. and 11 A.M. in the Columbus Park

area, the period when day laborers would be picked up, were dramatically higher in March and April of 2006 than in previous or subsequent months. (PX 112, DX 23.) In March and April respectively, 207 and 202 citations were issued—as compared with 22 in January, 49 in February, 79 in May, 87 in June, and 50 in July.

149. In conjunction with the checkpoint, the Village stationed several other officers on bicycle and in patrol cars in the Columbus Park area that stopped and ticketed contractors. (T. 152:5–15 (Zuniga), 325:11–326:3 (Lopez); Doe No. 3 ¶ 7; Rolon ¶ 34; PX112.)

150. In addition to the two motorcycle police at the traffic checkpoint and additional policemen on bicycle, the Hispanic Resource Center's records indicate that on an average day in March, there were 3 to 4 police cars in the area of Mamaroneck Avenue. (PX87 at JD0581; JD No. 7 ¶ 9.)

151. During the last week of March 2006, the Village issued 94 traffic tickets to commercial vehicles. (T. 762:19–763:5 (Trifiletti); PX 70.)

152. During March and April 2006, the Village issued over 400 tickets to vehicles in the Columbus Park vicinity between the hours of 7 a.m. to 11 a.m., which was between double and quadruple the number of citations issued in prior and subsequent months. (PX112; DX23.)

153. Landscapers and contractors use the types of vehicles that would be classified as commercial vehicles. The record of citations issued for safety violations on Mamaroneck Avenue supports the conclusion that a significant number of the vehicles cited belonged to a landscaping or contracting company. (T. 524:7–13 (Gerardi); PX 16.)

154. The checkpoint and traffic tickets were part of what the Mayor described to a New York Times reporter as a campaign

of "aggressively ticketing the day laborers and the contractors who hire them." (PX 70; T. 772:1–12, 776:15–21, 777:4–12 (West)).

155. The continued campaign directed at the day laborers manifested itself in many forms of harassment of workers and contractors during this time period, including the following:

a. Day laborers were instructed to line up single-file along the outside wall of stores near which they sought work. (T. 35:5–9 (Viera)).

b. Day laborers standing or sitting on Mamaroneck Avenue, Jefferson Avenue, and on the sidewalk near the Hess gasoline station were ordered to move from their location, both verbally or with gestures or using a police light. (Doe No. 4 ¶¶ 9–12; Doe No.1 ¶ 10; Doe No.6 ¶¶ 10–12; Doe No. 8 ¶¶ 12–14; Doe No. 3 ¶¶ 8–10; Rolon ¶¶ 27–28, 36–40, 42; T. 148:22–25, 149:1–25, 150:1–5, 163:5–19 (Zuniga); 327:1–22, 328:8–19 (Lopez); 619:14–15 (DiRuzza)). The day laborers were not obstructing pedestrian traffic at the times when they were ordered to move by police (T. 174:19–175:12 (Zuniga); 327:23–25, 328:1–5, 20–23 (Lopez); Doe No. 3 ¶ 8; Doe No. 8 ¶ 12.)

c. During March of 2006, police told John Doe No. 1 and other Latino men on a nearly daily basis that they could not stand in certain locations on the sidewalk along Mamaroneck Avenue and that they had to keep moving. (Doe No. 1 ¶ 10–11.)

d. John Doe No. 8 was ordered to move by Officer DiRuzza on fifteen to twenty occasions. (Doe No. 8 ¶ 13.)

e. John Doe No. 3 was threatened with arrest if he remained where he was seeking work on Jefferson Avenue because of the complaints of local business owners about day laborers allegedly scratching their cars. (Doe No. 3 ¶ 8.)

f. In March of 2006, while John Doe No. 6 was seated on a park bench in Columbus Park drinking a soda a police officer approached him and instructed him to move because the location where he was seated was where children played. (Doe No. 6 ¶ 9; T. 372: 8–14 (Doe No. 6)).

g. One morning in April 2006, John Doe No. 6 was standing on the sidewalk in front of the bakery on Mamaroneck Avenue with several other Latino day laborers when a police officer approached them and told them they could not stand there. (Doe No. 6 ¶. 10; T. 373:1–4 (Doe No. 6)).

h. On another occasion in April, John Doe No. 6 was standing near the Hess gas station when a police officer on a bicycle approached him and told him to move. (Doe No. 6 ¶ 11; T. 373:11–15 (Doe No. 6)).

i. Also in April, John Doe No. 6 was standing in front of Don Luis's Deli with some other day labors when an officer in a patrol car pulled up near to where he and the other Latino day laborers were standing on the sidewalk and instructed them to move. (Doe No. 6 ¶ 12; T. 375:2–6 (Doe No. 6)).

j. During the summer golf tournament, John Doe No. 8 was seeking work together with other Latino men on the sidewalk along Mamaroneck Avenue when they were told they had to move from that location. They were also told to find another spot to stand where people cannot see them. (Doe No. 8 ¶ 14.)

k. Police officers stared at day laborers for long periods of time and at close proximity, sometimes with one hand on a weapon. (T. 609:18–610:22 (Di-Ruzza); PX7; Doe No. 4 ¶ 11; Doe No. 3 ¶ 13; Doe No. 1 ¶ 8; Doe No. 6 ¶¶ 7–8; Rolon ¶¶ 27, 39).

l. Police parked their vehicles alongside where day laborers sit or stand and flashed their lights. (Doe No. 1 ¶ 4, Doe No. 4 ¶ 9; Rolon ¶ 40; T. 186:6–8 (Candamil)).

m. Policemen ticketed contractors as they were about to, or immediately after, they picked up day laborers. (PX8–14; T. 172:24–173:18 (Zuniga); 182:9–11, 183:5–19, 183:24–184:24 (Candamil); 279:1–280:11 (E.Garcia); 603:9–608:12 (DiRuzza); Doe No. 1 ¶ 5; Doe No. 6 ¶ 14; Doe No. 8 ¶ 15; Doe No. 3 ¶ 12.)

n. As a result, many contractors would quickly drive away as soon as they saw police nearby, not attempting to pick up any laborers at all. (Doe No. 3 ¶ 11; Doe No. 4 ¶ 14; Doe No. 6 ¶ 16.)

o. On or about March 17, 2006, John Doe No. 1 was riding in a contractor's vehicle that was pulled over by the police. John Doe No 1 was detained for approximately one to two hours and asked where he was from before finally being released (Doe No. 1 ¶ 12.)

p. One morning during April of 2006, John Doe No. 1 heard a police officer tell a contractor who had picked him up at Van Ranst Place and Mamaroneck Avenue that the contractor should pick up laborers someplace else (Doe No. 1 ¶ 13.)

q. Also in April, John Doe No. 6 observed police harassing a contractor and day laborers by forcing the day laborers that had been picked up by the contractor to exit the contractor's vehicle, then walk two blocks before re-entering the vehicle. (Doe No 6 ¶ 15; T. 378:4–10 (Doe No. 6)).

r. Chief Flynn ordered a police officer to monitor the drop-off of day laborers in the afternoons at Columbus Park to look for traffic violations. (PX6; T. 457:2–458:2 (Flynn)).

s. Police waved on contractors that slowed to pick up laborers, telling them to move on. (T. 181:16–21, 359:4–13 (Candamil)).

t. When asked by a contractor where it would be acceptable to pick up a day laborer, one police officer responded "how about nowhere." (T. 185:1–5 (Candamil)).

u. Police flashed their lights at the cars and trucks pulling over to pick up laborers, causing the cars to move on without picking up anyone. (Rolon ¶ 40; Doe No. 3 ¶ 11; Doe No. 1 ¶ 5.)

v. On the day this lawsuit was filed, the Communications Director of the Puerto Rican Legal Defense and Education Fund, was followed out of the Village by a Mamaroneck Village police car after picking up a day laborer to transport him to court. (Garcia ¶¶ 5–10.)

156. Incidents of harassment of day laborers and contractors pursuant to that campaign continue to the present day. (Doe No. 6 ¶ 16; T.180:12–14, 181:19–21, 184: 4–21, 185: 1–14, 186:6–17, 363: 8–365:11 (Candamil)).

157. No evidence in the record suggests that anyone other than the day laborers is subject to the kinds of law enforcement actions that are described in the foregoing two paragraphs.

158. Drivers of vehicles who are not seeking to pick up day laborers are less likely to be subjected to the kinds of law enforcement actions that are described in paragraphs 142 and 143. For example, vehicles stopping to pick up passengers in the Village, or children at their schools, are not given tickets, even if they block a lane of traffic when they stop. (T.31:1–19 (Viera)). The evidence does not show, however, that contractors were ticketed to the exclusion of all other commercial vehicles.

159. The police actions described in paragraphs 137 through 153 were undertaken for the purpose of reducing the number of contractors who would pick up day laborers.

160. The purpose of reducing the number of contractors was to reduce the number of day laborers in the Village of Mamaroneck.

161. As a result of the Village's campaign against contractors and day laborers:

a. A large number of contractors have stopped picking up day laborers in the Village of Mamaroneck. (T. 119:25–120:5 (Rolon); 182:4–11 (Candamil); 280:19–281:2 (E.Garcia); Doe No. 8 ¶ 15; Doe No. 3 ¶¶ 11–12; Doe No. 6 ¶ 16.)

b. A substantial number of day laborers have stopped seeking work in the Village of Mamaroneck. (T. 720:15–18 (Trifiletti); PX 70.)

c. Plaintiffs did not get work on some days. (Doe No. 3 ¶¶ 11, 14; Doe No. 4 ¶¶ 6–7, 16; Doe. No. 1 ¶ 7; Doe No. 1 ¶ 14; Doe No. 6¶ 18–19.)

d. Plaintiffs have, on occasion, been deterred from even seeking work. (Doe No. 3 ¶ 14; Doe No. 4 ¶¶ 6–7, 16; Doe No. 6 ¶ 9.)

## IX: ADDITIONAL FINDINGS OF FACT

162. The John Does are residents of the Village. For as long as they have lived in the Village, they have sought work along Mamaroneck Avenue and other public streets in the Village with other Latino workers. All of the John Does have always been able to gather to solicit work along the public streets of the Village and continued to do so through the time they testified at trial. (Cplt. ¶ 49; TT pp. 818; PX 103, PX 104, PX 105, PX 106, PX 109, PX 110.)

163. All of the John Does, other than John Doe 7 who became disabled in December, 2005, testified at trial that they continue to obtain work to this very day by gathering to solicit work along the public streets in the Village. (TT pp. 250–251, 402–403, 225, 382–384, 386, 267.)

164. None of the John Does has ever been issued a ticket, summons or citation by any Village police officer. (TT pp. 251–252, 403, 225–226, 386–387, 235–236, 269–270.)

165. None of the John Does has ever been arrested or taken into custody by any Village police officer while seeking work in the Village. (TT pp. 252, 404, 226, 387, 236–237, 270.)

166. Janet Rolon's logs do not contain any notes reflecting complaints from the John Doe plaintiffs concerning the Village police. Nor do her notes include any observation of any untoward activity addressed toward any of the John Doe plaintiffs specifically. Ms. Rolon testified, credibly, that she never heard any Village police officer use any racial or ethnic epithet or speak to a day laborer in a derogatory or offensive manner. (Tr. 125–6) Ms. Rolon also testified, credibly, that:

I have never seen police staring at non-Latino groups or individuals, or requir-

ing non-Latino individuals to abandon a park bench in Columbus Park. I have, however, observed police motioning to Latino men or telling them to move when these men weren't, in fact, day laborers. These were Latino men simply buying or eating breakfast before they began their regular employment for the day. Even prior to the closing of the hiring site, I sometimes saw police encouraging Latino males in Columbus Park who were not day laborers to enter the parking lot area.

(Rolon ¶ 43.)

167. Between January 1, 2006 and July 27, 2006, Officer DiRuzza of the Bike Unit issued 106 traffic summonses. Only five were for obstructing and/or impeding traffic in violation of VTL 1181 and 1202.

168. During the same period, the Village police collectively issued 757 traffic summonses in and around the Columbus Park area and 3,128 traffic summonses Village-wide. (DX 23.)

169. The Mayor and Police Chief have involved themselves in numerous activities relating to the Latino/Hispanic community in Mamaroneck. The Mayor had been involved in inter-community conversations concerning the need for day laborer hiring.

170. None of the 128 day laborers who responded to a survey conducted by Dr. Maria Munoz Kantha and Luis Quiros between April 14 and 24 voiced any complaint about misconduct by Mamaroneck Village police. (DX 83.) However, at a meeting with Mayor Trifiletti in August 2005, the day laborers in attendance—after thanking the mayor and expressing a desire to be good citizens—made a mild complaint about feeling intimidated by the police presence. (T: 782:105)

171. The complaints and purported fears of certain Village residents were mo-

tivated, consciously or unconsciously, by racial animus towards the day laborers.

172. Examples of this include the following:

a. Despite having no reasonable basis to believe that day laborers were dangerous or violent, Robert Nask, a Village resident who testified at trial, stated that his wife does not feel safe taking their children to the park. (T. 544:11–16 (Nask)).

b. Mr. Nask testified that when day laborers approached his truck he believed they were simply looking for work and mistook him for a contractor, yet "I had to stop and put my windows up quickly before one approached, honking the horn to get them out of the way." (T. 542:6–23 (Nask)).

c. Marni Nigro of Nana's Kids, a Village daycare center located at 615 Mamaroneck Avenue with a rear entrance on Van Ranst Place, testified that Nana's Kids caters to "professional families." (T. 546:14–20, 555:8:–17 (Nigro)) and that the presence of day laborers supposedly caused her to lose several families who were "intimidated by the crowds." (T. 553:24–554:2 (Nigro)).

d. Despite having no reasonable basis to believe the day laborers were dangerous or violent, Ms. Nigro requested a police presence when parents dropped of their children. (T. 551:11–24 (Nigro)).

e. Village resident Jennifer VonEiff was "very upset" when a day laborer was picked up in her driveway. This incident caused Sgt. Ferraro to put an extra patrol in that location. The mayor personally directed the police to stay on top of the situation, saying he had spoken with Ms. Vo-

nEiff who was "very worried she is not safe in her house." (PX 44.)

## CONCLUSIONS OF LAW

### I. STANDING

The individual John Doe plaintiffs of course have standing to prosecute this action. However, NDLON does not.

■ To sue on its own behalf, an organization must satisfy the same constitutional standing test that applies to individuals. *ILGO v. Giuliani*, 143 F.3d 638, 649 (2d Cir.1998). To meet that test, the plaintiff organization must prove that it has suffered an injury in fact, that the injury and the challenged conduct are causally connected, and that the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ Because of the injury in fact requirements, an organizational plaintiff must demonstrate that it has more than simply "an abstract concern with a subject that could be affected by an adjudication" of the pending case. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

■ Moreover, an organization lacks standing to sue in its own right as a result of injuries that are not fairly traceable to the defendant. *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 (3d Cir.1998), the Court of Appeals held that an advocacy group's allocation of resources to review allegedly discriminatory advertisements did not confer standing because the organization failed to prove that it would not have undertaken the same actions in the absence of the allegedly illegal acts by the defendants. *See also Assn. for Retarded Citizens of Dallas v. Dallas County Men-*

*tal Health & Mental Retardation Center Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir.1994) ("the mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization....").

■ An organization cannot manufacture injury in fact by bootstrapping the expenditure of resources on the lawsuit in which it alleges that it has standing. *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990).

■ Under these settled principles, NDLON lacks standing to pursue this action on its own behalf.

The injury complained of in the complaint is the injury to the John Does by virtue of the limitation on their ability to seek work in the Village of Mamaroneck. NDLON has, of course, devoted itself to championing the rights of day laborers throughout the United States, but that alone does not confer standing on the group, because that is the reason NDLON exists—to advocate on behalf of day laborers, and to work for the repeal or invalidation of laws that restrict the ability of day laborers to solicit employment.

So NDLON alleges that it has expended "substantial" resources to respond to the escalation of police enforcement in Mamaroneck, and that its staff members have repeatedly met with all parties in Mamaroneck. The resources utilized by NDLON in this case were time and expenses for both Mr. Newman and Mr. Fernando Pacheco (NDLON's East Coast Coordinator) to travel to the Village to meet with day laborers to discuss day laborer issues in the Village—including issues relating to this lawsuit—and to meet with people in Mamaroneck three or four times in connection with the de-designation of the

542

Parking Lot Site. NDLON claims that defendants' actions have caused it to divert its resources from other projects to this project. It does not quantify the amount of the "diversion," but it does not include any litigation costs, since NDLON is being represented for free.

NDLON's entire reason for being is to pursue the sort of advocacy (including advising day laborers, advocating for them *vis a vis* municipalities, and instituting litigation) that it has pursued in this case. This is how the organization expends its resources. It thus stands to reason that spending staff time and resources on day laborer advocacy and advice does not work any injury to the organization. If all that an advocacy group like NDLON needed to prove to establish injury in fact were a "diversion" of resources away from an equivalent project in Santa Fe or Birmingham, then an advocacy organization would always have standing, because any money it expends on a project in location X could as easily have been expended on an identical project in location Y. The fact that the organization chose to support the Mamaroneck day laborers means that it cannot support the day laborers in some other city, that does not translate into an injury to NDLON caused by defendants. NDLON simply made a choice about where and how to spend its limited resources.

It is simply not the case that, as a result of defendants' actions, NDLON has devoted resources to the day laborer situation in Mamaroneck "above and beyond what it would have in the ordinary course of business," because the ordinary course of business for NDLON is responding to the ever-changing situations in the localities on which it has chosen to focus. *Havens Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) or *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d

898 (2d Cir.1993)—cases NDLON relies on to support its claim of standing—are not to the contrary. Both cases involved suits by organizations under the Fair Housing Act. In *Havens Corp.,* the organizational plaintiff, HOME, provided counseling and referral services to low and moderate income persons who were looking for housing. The Supreme Court held that the defendant's racially discriminatory practices "perceptibly impaired" the organizational plaintiff HOME's ability to provide those counseling and referral services. *Id.* at 378, 102 S.Ct. 1114. Similarly, in *Ragin,* the Second Circuit upheld the district court's conclusion that identifying and counteracting the defendant's racially discriminatory advertising practices diverted the organizational plaintiff OHC's attention from its "regular tasks" of counseling and referral services. 6 F.3d at 905.

In this case, NDLON offered no evidence of some other type of work that it does from which it was diverted by virtue of having to come to send representatives to Mamaroneck. As Ms. Rolon's presence attests, NDLON was in Mamaroneck for the purpose of monitoring a changing situation. Sending in its officers to consult about that work is part and parcel of its fundamental mission in the Village. NDLON simply has not shown that the pre-suit advocacy it undertook on behalf of Mamaroneck's day laborers is anything other than its "regular tasks." Therefore, NDLON has not demonstrated any injury in fact caused by the actions of the defendants.

NDLON does not suggest that it purports to sue in as associational capacity, and in any event it has no individual members, and the court knows nothing about its corporate members.

NDLON's claims are dismissed.

## II. EQUAL PROTECTION ANALYSIS

Since August 2004, and continuing into this past summer, the defendants have engaged in a campaign designed to drive out the Latino day laborers who gather on the streets of Mamaroneck to seek work. The fact that the day laborers were Latinos, and not whites was, at least in part, a motivating factor in defendants' actions.

It is a basic requirement of law that "government.... treat all similarly situated people alike." *Harlen Assocs., Inc. v. Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001), quoting *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In this case, plaintiffs assert that defendants have violated their right to equal protection under three separate theories.

■ First, relying on *Pyke v. Cuomo,* 258 F.3d 107, 110 (2d Cir.2001), plaintiffs assert that defendants applied a facially neutral law or policy to them in an intentionally discriminatory race-based manner. Under this theory, plaintiffs are not obligated to identify a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection. *See also Brown v. Oneonta,* 221 F.3d 329 (2d Cir.2000). This strand of equal protection analysis dispenses with the need to plead that a similarly situated group was treated differently because discriminatory effects are either independently demonstrated or can readily be presumed. Once racially discriminatory intent infects the application of a neutral law or policy, the group that is singled out for discriminatory treatment is no longer similarly situated to any other in the eyes of the law, so adverse effects can be presumed. In effect, the law recognizes that a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose.

Second, plaintiffs assert, relying on *Le Clair v. Saunders,* 627 F.2d 606 (2d Cir. 1980), that they were treated differently than an identifiable, similarly situated group of individuals for malicious reasons, including but not limited to racial prejudice.

Finally, under "class of one" Equal Protection analysis, plaintiffs claim that they were intentionally treated differently from others similarly situated and that there was no rational basis for this difference in treatment. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

The latter two theories require plaintiffs to identify a similarly situated person or group that was treated differently.

### A. Facially Neutral Law or Policy Discriminatorily Applied

Viewing the findings of fact as a whole, the court readily concludes that, from and after late 2004, the Village of Mamaroneck adopted a policy of trying to reduce or eliminate the presence of day laborers in the Village. A series of actions, undertaken at various times since August 2004—the herding of the day laborers to a single hiring site, the sudden and unprecedented posting of excessive police presence at and around that site, the sudden enforcement of various local traffic ordinances only against persons who appeared to be interested in hiring the day laborers, the sudden and unanticipated dismantling of the hiring site, and the harassment and ticketing of both day laborers and contractors interested in hiring them when the laborers returned to the streets of Mamaroneck following the dismantling of the Site (to name several that are borne out by the findings of fact already recited)—were implemented to carry out that policy.

However, as plaintiffs candidly admit (see Letter dated October 25, 2006), this

particular policy cannot satisfy the "facially neutral but discriminatorily enforced" aspect of *Brown/Pyke* equal protection analysis, because it was in no way "facially neutral." Rather, the evidence clearly supports the contention that the policy was aimed at particular individuals—day laborers and those who hire them. A policy targeted at particular individuals is by definition not facially neutral.

So Plaintiffs instead argue that several of the strategies employed in carrying out that overall policy constituted intentionally discriminatory and race-based applications of facially neutral laws or policies. (Letter Dated October 25, 2006). Plaintiffs allege that targeted traffic ticketing directed against the contractors who pick up day laborers represents a discriminatory application of a facial neutral law under the *Brown/Pyke* standard. They also contend that "the law" requires Village officials to "leav[e] people alone when they are doing nothing more than standing on the sidewalk not bothering anyone" (*Id.* (citing *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90–91, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965))), and argue that members of the Mamaroneck Police Department, acting at the behest of the Mayor and Village Board, undertook a policy of harassing day laborers—and occasionally other Latinos (who were presumably mistaken for day laborers)—while they were simply standing on the sidewalks, while leaving everyone else on the sidewalk alone.

Defendants challenge plaintiffs' ability to invoke the *Brown/Pyke* "facially neutral law or policy applied in an intentionally discriminatory manner" analysis. They argue that, "Despite some rhetorical flourishes," plaintiffs' claims can only be analyzed under the rubric of "selective enforcement," with its concomitant requirement of proof that similarly situated persons—or a similarly situated group—were treated differently. *See U.S. v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *LeClair*, 627 F.2d at 609.

For the reasons that follow, I disagree that this argument conflates with the "selective prosecution" argument advanced by plaintiffs under *LeClair* (which is analyzed separately below). However, I need to consider the two types of violations identified by plaintiffs separately. I will first analyze whether plaintiffs have satisfied their burden of going forward—which they have—and then turn to whether defendants have established that they would have taken the same actions without regard to plaintiffs' ethnicity—which they have not.

■ *1. Traffic Ticketing:* The facts found by the court concerning the targeted ticketing campaign do indeed smack of "selective enforcement" as one possible theory under which to adjudicate the plaintiffs' claims. But where, as here, a particular group (day laborers and those who hire them) was specifically targeted for heightened enforcement of certain types of laws—like those involving traffic violations—it will be all but impossible to find a similarly situated group of persons. *Pyke* and *Brown* stand for the proposition that this is no bar to an equal protection claim.

In *Brown*, plaintiff black residents of municipality alleged that defendant police officers improperly located and questioned only black residents in connection with a crime in which the victim identified the perpetrator as black. Plaintiffs' theory was that the "express racial classification" inherent in this "policy" violated their equal protection rights. While rejecting plaintiffs' claim on the merits (there was no unlawful racial profiling because the victim had identified the perpetrator as black), the Second Circuit acknowledged that it is not necessary to plead or prove

the existence of a similarly situated non-minority group when challenging a law or policy that contains a racial classification, because such a law or policy is subject to strict judicial scrutiny. 221 F.3d at 337.

In *Pyke,* the claimants were Native American anti-gambling demonstrators who brought a § 1983 action alleging that New York official denied them equal protection by failing to provide police protection to them on their reservation. 258 F.3d 107. Although the Second Circuit wrote, "It would be difficult, if not impossible, to find other individuals whose situation is similar to Native Americans living on a reservation and exercising a substantial measure of self-government independent of New York State," it refused to hold that plaintiffs were thereby barred from claiming an equal protection violation. *Id.* at 109. "So long as they allege and establish that the defendants discriminatorily refused to provide police protection *because the plaintiffs are Native American,* plaintiffs need not allege or establish the disparate treatment of otherwise similarly situated non-Native American individuals." *Id.* (Emphasis added)

Most similar to the instant case is *United States v. Duque–Nava,* where the court found, in the context of a challenged traffic stop, that imposing the "similarly situated" requirement made a claim of selective enforcement impossible to prove, a result that *Armstrong* does not sanction. 315 F.Supp.2d 1144, 1154 (D.Kan.2004). Instead the court permitted the claimants to prove discriminatory impact through the use of statistical evidence. The court reasoned as follows:

> More importantly, how could a defendant even *with discovery,* show a similarly situated individual who was *not stopped?* Law enforcement agencies keep records of law enforcement activity. Like many police agencies, the Russell County Sheriff does not record every traffic stop an officer makes. Rather, the only recorded stops are those that result in a written ticket or warning citation. Stops that result in a verbal warning are not recorded. To the extent that there is a record, it often doesn't include pertinent data such as race or ethnicity.
>
> In fact, a law enforcement agency cannot record any, much less all pertinent information on the dozens, hundreds, or even thousands of motorists who are not stopped within a patrolling officer's given space and time. If a law enforcement agency engaged in this type of activity, a nation of our democratic principles and constitutional liberties would find abhorrent such a practice of recording information on every person the officer. It is virtually impossible to identify a "similarly situated" individual who was not stopped. The person cannot be identified at all, nor is there any recorded information from which one can compare whether the motorists presented similar factors to an observing officer, such that there had been disparate treatment or not. Because law enforcement agencies do not make or keep records on individuals they do not stop, and certainly not on "similarly situated" individuals they do not stop, imposing such a requirement on this defendant or any defendant who challenges a traffic stop as selective enforcement, effectively denies them any ability to discover or prove such a claim. Thus, the defendant challenging a traffic stop for selective enforcement, must be allowed to show discriminatory effect in some other way. (*Id.* at 1155.)

In cases like *Pyke* and *Duque–Nava,* it was deemed appropriate to dispense with the requirement that plaintiffs actually identify a similarly situated group that was

treated differently than the target group *because the Government's differential treatment of the target group could otherwise be clearly demonstrated.* The *Pyke* analysis implicitly recognizes that a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose.

Rarer still is the case in which the record shows as clearly as the record in this case that a government affirmatively undertook such a campaign. When the Mayor announces that the day laborers represent an "out of control problem," and puts a plan in place to reduce the number of day laborers in the village through a campaign of "aggressively ticketing the day laborers and the contractors who hire them;" when the police chief directs his subordinates to subject the contractors who hire day laborers to rigorous and time-consuming inspections and orders a police officer to monitor the drop-off of day laborers in the afternoons to look for traffic violations; when a dissenting trustee candidly admits that, after chasing the day laborers out of the park, the police set up unprecedented checkpoints on Mamaroneck Ave. to get rid of them—on such a record, no doubt remains that defendants' actions were intended precisely to harass and intimidate contractors and thereby to deter them from picking up day laborers in Mamaroneck.

Moreover, the record also demonstrates that, at least insofar as the targeted traffic ticketing campaign was concerned, the Village did not fail to achieve its purpose. Its campaign of harassment and intimidation against the Latino day laborers in Mamaroneck—effectuated through the discriminatory application of a neutral law (the VTL)—has had precisely those adverse effects that were intended. The evidence was adduced at trial proved beyond perad-venture that the number of contractors who came to Mamaroneck to pick up day laborers in the Village of Mamaroneck in the wake of the targeted ticketing campaign was substantially reduced. (*See e.g.* Finding of Fact 161.) This evidence of adverse and discriminatory effects means that, while plaintiffs' relationship to the rest of the population of Mamaroneck may not be quite as idiosyncratic as that of the plaintiffs in *Pyke*, this is still a case in which the requirement of showing a similarly situated group should not be erected as an insurmountable barrier to plaintiffs' equal protection claim.

The thornier question is whether the record will also support a finding that the targeted ticketing campaign was aimed at a protected group—*Latinos*—which is a necessary element of the *Brown/Pyke* test relied on by plaintiffs.

■ Proving intent to discriminate is a two-step process. First the plaintiffs must show

that the actions of the municipal defendants were "motivated at least in part by a racially discriminatory purpose." *United States v. City of Yonkers,* 96 F.3d 600, 612 (2d Cir.1996). If plaintiffs meet this burden, defendants must establish that the same result would have been reached without consideration of race. *Id.*

In this case, the answer to the question, "Were defendants' actions motivated, at least in part, by a racially discriminatory purpose?" is yes.

The Village's traffic enforcement policy was admittedly targeted at day laborers and the contractors who wanted to hire them. In the mayor's own words these groups were subjected to "aggressive ticketing."

The evidence that the day laborers were exclusively or almost exclusively Latino is undisputed. (Finding of Fact 31.)

The evidence showed that village police did not strictly enforce, and sometimes ignored, traffic and parking infractions that occurred in other parts of the Village than Columbus Park, or that were committed by persons other than contractors. (Finding of Fact 68.) Indeed, the evidence showed that, in contrast to a virtual zero tolerance policy applied to contractors seeking to hire (Latino) day laborers, vehicles stopping to pick up passengers in the Village or children at their schools are not given tickets, even if they block a lane of traffic when they stop. (Finding of Fact 158.)

Moreover, there is evidence in the record from which one can infer the race-based nature of the campaign. Latino drivers who were not necessarily contractors were subjected to law enforcement activity that was not being directed at white drivers. One store owner specifically observed Latino drivers being ticketed outside his store for not wearing a seatbelt; but when police officers saw white drivers not wearing their seatbelts, they made a gesture to show that the drivers should buckle their seatbelts but did not ticket them. (*Id.*)

Insofar as the ticketing campaign targeted Latino drivers, it obviously contains the selective racial component required to find a *Brown/Pyke* "facially neutral law discriminatorily applied" violation. However, the court also concludes that the racial component of this analysis is satisfied by the Village's explicitly announced intention to wage a ticketing campaign against persons who would seek to hire day laborers. This court has previously ruled that a non-Latino business owner had standing under 42 U.S.C. § 1981 to challenge action undertaken against her but actually aimed at her Latino day laborer customers. *Stern v. Resnick*, 99 Civ. 10053. In *Stern*, this court relied on a number of cases unequivocally holding that non-minority plaintiffs have standing to challenge private parties' adverse actions against them that were motivated by racial animus toward third-party minorities. *See e.g. Sullivan v. Little Hunting Park Inc.*, 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Albert v. Carovano*, 851 F.2d 561, 571–72 (2nd Cir.1988). It is, of course, axiomatic that non-minority plaintiffs have standing to sue in order to vindicate the rights of third-party minorities in the Equal Protection context as well when these non-minority plaintiffs are uniquely positioned to assert the rights of the absent third party minorities. *See Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

In the present case, there is no need for the non-minority victims of the Village's discriminatory campaign to stand in the shoes of the Latino day laborers in order to vindicate their Equal Protection rights. The day laborers themselves are plaintiffs in this action. If the contractors could bring an Equal Protection claim on the basis of adverse government action undertaken against them but motivated by racial animus against the Latino day laborers, that same discriminatory official action can surely serve as a basis for the day laborers' own Equal Protection challenge.

■ Consideration of the factors announced in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)—(1) the historical background of the decision, (2) the specific sequence of events leading up to the challenged decision, (3) whether there were any departures from the normal procedural sequence, and (4) contemporary statements made by the decision-making body—adds to the court's conviction that the Village intended to discriminate on a forbidden ethnic/national origin basis.

██ Historically, Mamaroneck was highly tolerant of day laborers. Indeed, the parties stipulated that Mamaroneck had long been a place where casual workers have gathered in the morning to seek employment from contractors. However, the day laborers of yore were Caucasian. Today's day laborers are not. In the absence of evidence supporting any other conclusion, it is fair to infer that the change in racial/ethnic composition of the day laborer pool had something to do with the development of overt hostility toward those seeking per diem work in Mamaroneck.

The sequence of events leading up to the targeted ticketing campaign does not undercut this race-based inference.

First, the Village's publicly-stated specific reason for taking action against the day laborers—that they were overrunning Mamaroneck and engaging in anti-social behavior—does not stand up to scrutiny. While Village officials pandered to some local residents and business people by making public statements about the inflated number of day laborers in Mamaroneck in and after 2004, the hard evidence demonstrates that the number of day laborers gathering in the Village, today and in the recent past, is the same, or at most only slightly larger, than the number of workers who used to gather in the Village's public areas to seek per diem work. The claims about day laborers' contribution to quality of life issues are entirely specious. (*See infra* pp. 553 – 554.)

Second, decisions made by Village Trustees and law enforcement officials, as part of implementing its overall policy were departures from the norm, and from normal procedures, in at least the following respects:

1. The increased police presence in and around Columbus Park as soon as the Site was established constituted a radical change from the policing that had taken place in prior years. (See Findings of Fact 35, 45–50) Moreover, the fact that the Police Chief would not remove or modify the additional police presence except on the order of the Board of Trustees was not normal, since the Board did not ordinarily involve itself in policing decisions. (Tr. 27; Finding of Fact 71.)

2. The Village's adoption of the resolution closing the Site did not follow proper procedural precedent; the resolution was not on the Trustees' agenda for the January 23, 2006 meeting and there had been no opportunity for public hearing or comment. (Finding of Fact 104–106.)

3. The actions taken with respect to the closing of Van Ranst Place and Sheldrake Place to through truck traffic as soon as the Site closed departed from the Village's long-standing practice of not enforcing an existing "no through trucks" regulation that had long applied to Van Ranst. (Findings of Fact 127–131.)

4. Until the Site closed, there had never been any sort of traffic checkpoint on Mamaroneck Avenue between Grand and Sheldrake. (Findings of Fact 141–143.)

5. Chief Flynn's order that vehicles picking up day laborers be brought to the harbor and subjected to Department of Transportation safety inspections represented the first time the Chief had ever ordered officers outside the Traffic Unit to take vehicles in for inspection, or had designated specific vehicles for inspection. (Finding of Fact 133–134.)

In short, throughout the period from August 2004 through the summer of 2006,

the behavior of Mamaroneck's public officials, both elected and police, differed from the behavior of those officials prior to the adoption of the policy to reduce or eliminate the day laborer presence.

Finally, there are the contemporaneous comments made by Mamaroneck's public officials. Plaintiffs correctly point out that Village officials stigmatized the day laborers in repeated public pronouncements, grossly exaggerating their numbers, asserting—without any basis in fact—that they were not residents of the Village and accusing them—again without any basis in fact—of engaging in criminal and disorderly conduct.

By citing to several books chronicling the woes of immigrants in suburbia—books that are not in evidence and that are replete with hearsay about things that happened in other communities at other times—plaintiffs argue that these stigmatizing actions encouraged racial bias by playing to "stereotypes" of Hispanics. Additionally, plaintiffs point to specific comments that, according to them, carried a racial tinge—for example, Trustee Angilletta's comment comparing the day laborers to "locusts" and decrying them as "takers" who "won't ever give back to the community."

The problem with plaintiffs' argument is that there is no evidence in the record about particular stereotypes that are applicable to Latinos (although there are, no doubt, persons who are expert in such matters who could have testified on the subject). Trustee Angilletta's ugly comment could be some sort of ethnic stereotype, but it could just as easily refer to a stereotype about undocumented aliens generally, rather than undocumented aliens of Hispanic origin. The fact that there are similarities between the types of accusations made against Latino day laborers in *Stern v. Resnick* and the types of accusations made against Mamaroneck's day laborers is far too slender a reed on which to base generalized conclusions about the ways in which Latinos (as opposed to illegal immigrants generally) are "stereotyped" in our society. Certainly this is not something of which the court can take judicial notice.

However, plaintiffs do not need to go that far. Whether or not they are predicated on stereotypes, the claims and comments made by public officials in Mamaroneck about the day laborers who plied the streets of Mamaroneck looking for work were negative and stigmatizing. That is some evidence of racism. And while Defendants vigorously deny that race had anything to do with the unremitting hostility they displayed toward the day laborers, the evidence—including Mamaroneck's historical friendliness to day laborers during the period when they were predominantly Caucasian and the race-conscious nature of the law enforcement campaign waged against the day laborers and those who hired them (including the fact that drivers of Latino heritage were ticketed for not wearing their seatbelts while Caucasians not wearing their seatbelts were given a free pass)—dramatically undercuts their argument.

So plaintiffs have met their burden of going forward on the issue of intentional racism.

**2. Targeted Harassment:** With respect to the day laborers themselves, plaintiffs argue that police harassment of the day laborers represents a discriminatory application of the neutral (and constitutionally-mandated) policy that requires the police to leave people alone when they are doing nothing more than standing on the sidewalk. Viewed as a whole, the findings of fact support the conclusion that defendants' application of this policy in the case

of the day laborers was infected with intentional racial discrimination.

Plaintiffs have more than met their burden of going forward with evidence that there was a campaign of targeted harassment, and that it was, at least in part, based on the race or ethnicity of the day laborers.

The evidence points inexorably to the conclusion that the police department intentionally discriminated against the plaintiffs and other day laborers by refusing to leave them alone—and instead repeatedly harassing them and telling them to move along when they were simply standing on the sidewalks of Mamaroneck.

Background evidence showed that in late August and early September 2004, the Mayor began making unfounded statements that the numbers of day laborers in Mamaroneck had grown to 200 to 225 and that the great majority of these workers were not residents of the Village. (Finding of Fact 39.) These inflated numbers— that the Mayor later (falsely) characterized as an "out of control problem"—were designed to justify the campaign of harassment and intimidation that followed. When the day laborers first began to gather at the Site, the police department, acting on instructions from the Mayor and the Board of Trustees began treating them in a manner that made them feel "tense and angry and agitated and as if they were criminals." (Finding of Fact 47.) Witnesses who visited the site during the first week of its operation described the heavy police presence and the agitated state of the workers. (Finding of Fact 50.) Abusive and intimidating police behavior toward plaintiffs and other laborers continued throughout the period of the Site's operation. (Finding of Fact 69.) [3]

After February 1, 2006, when the Site closed, Village police continued to discourage workers from seeking work, not only at the parking lot, but also anywhere along Van Ranst after the closure of the Site. (Finding of Fact 123.) Specific examples included the following (Finding of Fact 124):

1 John Doe No. 8 was threatened with arrest if he remained in the area.

2 John Doe No. 4 was threatened with a ticket if he did not move from the intersection of Van Ranst Place and Mamaroneck Avenue. He was also told that he could not be near Columbus Park nor on Mamaroneck Avenue because the area was no longer a place for day laborers to seek work.

3 Some time after the incident described above, John Doe No. 4 was again threatened with a ticket if he did not move from the place he was drinking coffee, alone, on Mamaroneck Avenue.

4 John Doe No. 3 was told to leave the area of Columbus Park because the owners of the construction site and the rest of the community did not want to see him in the Park anymore.

After the day laborers moved from Van Ranst onto Mamaroneck Ave. in mid-March 2006, the harassment of the workers continued apace. Specifically, evidence adduced at trial showed that:

1 Day laborers were instructed to line up single-file along the outside wall

---

**3.** Of course, since plaintiffs' *Pyke* claim encompasses only those instances of police harassment of the day laborers that took place on the sidewalks of Mamaroneck, any harassment or intimidation that took place before the closure of the Site forms the background to, not the basis for, their claim. But as in any civil rights case, background information provides some evidence of the Village's motive.

of stores near which they sought work.

2 Day laborers standing or sitting on Mamaroneck Avenue, Jefferson Avenue, and on the sidewalk near the Hess gasoline station were ordered to move from their location, both verbally and by gestures (including use of a police light). The day laborers were not obstructing pedestrian traffic at the times when they were ordered to move by police.

3. During March of 2006, police told John Doe No. 1 and other Latino men on a nearly daily basis that they could not stand in certain locations on the sidewalk along Mamaroneck Avenue and that they had to keep moving.

4. John Doe No. 8 was ordered to move by Officer DiRuzza on fifteen to twenty occasions.

5. John Doe No. 3 was threatened with arrest if he remained where he was seeking work on Jefferson Avenue because of the complaints of local business owners about day laborers allegedly scratching their cars.

6. In March of 2006, while John Doe No. 6 was seated on a park bench in Columbus Park drinking a soda a police officer approached him and instructed him to move because the location where he was seated was where children played.

7. One morning in April 2006, John Doe No. 6 was standing on the sidewalk in front of the bakery on Mamaroneck Avenue with several other Latino day laborers when a police officer approached them and told them they could not stand there.

8. On another occasion in April, John Doe No. 6 was standing near the Hess gas station when a police officer on a bicycle approached him and told him to move.

9. Also in April, John Doe No. 6 was standing in front of Don Luis's Deli with some other day labors when an officer in a patrol car pulled up near to where he and the other Latino day laborers were standing on the sidewalk and instructed them to move.

10. During the summer golf tournament (the United States Open in Mamaroneck), John Doe No. 8 was seeking work together with other Latino men on the sidewalk along Mamaroneck Avenue when they were told they had to move from that location. They were also told to find another spot to stand where people cannot see them.

11. Police officers stared at day laborers for long periods of time and at close proximity, sometimes with one hand on a weapon.

12. Police parked their vehicles alongside where day laborers sit or stand and flashed their lights.

Like the targeted ticketing of contractors, this campaign of targeted harassment against the day laborers (which continued throughout the period leading up to the trial) did not fail to produce precisely those adverse effects on the day laborers that the Village intended. The Village set out to reduce the number of day laborers seeking work in Mamaroneck through an aggressive law enforcement campaign of harassment and intimidation targeted against them, and it succeeded. Less a month after the heavy police presence was established around Columbus Park in 2004, the number of day laborers dwindled from about 80 to 100 to approximately 30 to 40, prompting the Mayor subsequently to boast, "We no longer have a day laborer problem." (Findings of Fact 41, 51, and 52.) Likewise, the harassment and intimidation of day laborers as they gathered in

the streets following the closure of the Site has prevented a substantial number of day laborers from ever seeking work in the Village, and has on occasion deterred the plaintiffs themselves from seeking work in the Village. (Finding of Fact 161.)

The evidence also shows that race was a motivating factor in defendants' discriminatory harassment of the day laborers. The *Arlington Heights* analysis conducted above with respect to the targeted ticketing of contractors applies with equal force to the targeted harassment of the day laborers themselves. In this regard, it bears noting that the harassment of the day laborers in the streets of Mamaroneck subsequent to the closing of the day laborer Site represents but the final phase in an ongoing campaign to reduce their numbers substantially or drive them out of the Village.[4] The sequence of events leading up to this last phase bolsters the inference that the campaign of harassment itself was undertaken, at least in part, for racially discriminatory reasons. The evidence supporting this conclusion is discussed extensively above, and that discussion need not be repeated here.

In addition to the negative and stigmatizing comments official comments discussed above, the following factors bolster the court's conclusion that police harassment of day laborers in the streets of Mamaroneck was tinged with racism. At trial, Janet Rolon testified credibly as follows:

> I have never seen police staring at non-Latino groups or individuals, or requiring non-Latino individuals to abandon a park bench in Columbus Park. I have,

however, observed police motioning to Latino men or telling them to move when these men weren't, in fact, day laborers. These were Latino men simply buying or eating breakfast before they began their regular employment for the day. Even prior to the closing of the hiring site, I sometimes saw police encouraging Latino males in Columbus Park who were not day laborers to enter the parking lot area.

(Finding of Fact 166.) In effect, this testimony shows that plaintiffs' status as day laborers was inextricably intertwined with race in the minds of the law enforcement officials charged with implementing the Village's discriminatory law enforcement campaign. As a result, not only the day laborers but all Latino men risked being subjected to police harassment and intimidation for doing nothing more than standing on the sidewalks of Mamaroneck. Such race-consciousness in law enforcement activity is clearly impermissible.

Moreover, the behavior of the police officers and their comments to the day laborers provide further evidence of racial animus. On at least two separate occasions, a day laborer was told to move somewhere where he could not be seen or that "the community" did not want to see him in a given place anymore. (Findings of Fact 124 and 155.) Such stigmatizing commentary is utterly inconsistent with any conceivable legitimate law enforcement objectives and further supports the inference that the police officers' activity was infected with an impermissible racial bias.

---

4. Although plaintiffs' challenge is not directed at this campaign as a whole, the Village's admitted goal of driving the day laborers out of Mamaroneck is itself profoundly troubling, even under the barest of constitutional scrutiny. As the Supreme Court stated in *Romer v. Evans*, "If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." 517 U.S. 620, 634, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

Again, this conduct is appropriate for analysis under the *Pyke/Brown* rubric. Because plaintiffs have adduced overwhelming evidence of defendants' intentionally discriminatory application of a neutral policy to the Latino day laborers of Mamaroneck under *Pyke,* they can proceed without showing that a similarly situated group was treated differently.

■ *3. Defendants' Response:* Because plaintiffs have met their burden of going forward on the issue of intent to discriminate, I turn to the defendants' argument that the same result would have been reached without any consideration of race. I find the evidence in support of that argument unpersuasive. There is no question in the court's mind that the reasons given by defendants for the increased and unprecedented law enforcement activity in the area where the day laborers congregated are wholly pretextual; indeed, the evidence of pretext is overwhelming.

The defendants claim that legitimate law enforcement concerns—a sudden upswing in so-called "quality of life" problems—motivated their increased activity in the Columbus Park area.

However, the cold facts, gleaned from the files of the Police Department, show that the area where the day laborers gathered experienced nothing more than sporadic and rather unremarkable criminal activity between mid–2004 and mid–2006.

Moreover, there is not even an arguable relationship between the activities undertaken by the police during that period and controlling "quality of life" issues. In August 2004, when the Village decided to move the workers to the Site, the Mayor and Police Chief agreed on a plan to concentrate law enforcement personnel in the Columbus Park area between 7 a.m. and 11 a.m.—exactly the time the day laborers were gathered in that area seeking work.

The mayor claimed that his concern was "urinating in public, defecation, catcalls, fighting, drinking, blocking sidewalks, littering, smoking marijuana and sleeping overnight" in the park. However, police logs do not demonstrate any link between any of these activities and the presence of day laborers in Columbus Park between 7 a.m. and 11 a.m. The purported connection is not even logical: if there is a problem with people sleeping overnight in the park, the solution is hardly to post police around the park during the morning hours! Nor does one fight quality of life crime like crack usage or defecation under a bridge by issuing more than 200 traffic summonses!

The police themselves testified that quality of life issues did not relate to day laborers (T. 485: 5–9 (Ferraro)). The only complaint of urination that appears in the log occurred five blocks from Columbus Park, and it happened at night (PX 33, MK01880). There is no evidence that day laborers were involved in the gang activity that Tony Fava identified as the "biggest problem" in the Washingtonville area (Tr. 595–598).

The Village's claim that an increased police presence was necessitated by a "large gathering of men" is undercut by the fact that the Village did not (and apparently could not, because of lack of staff) assign police officers to be present at another "large gathering of men"—night basketball games in Columbus Park, where more than 100 persons were present, and which had, in the past, been the site of fights. (Finding of Fact 62) And the fact that the police car was not stationed at the Site until the day laborers were told to gather there—and ceased to be stationed there as soon as the day laborers were ordered not to gather there—cannot be connected to a sudden drop in crime

around the Site, because there is no evidence in the record that crime dropped at or about the time the Site was closed. This speaks volumes about the unstated but true motivation behind the police presence in the area.

Once the Site was closed, the police adopted a strategy of aggressively ticketing day laborers and the contractors who hire them. (Tr. 772; PX 70). Again, huge numbers of tickets were issued, resulting in the disappearance of day laborers. According to the Mayor, this brought the situation "under control." (PX 70) Yet there is no evidence that the situation was "out of control." The police logs show NO complaints about "urination, the cat calls, all that kind of stuff" which supposedly "came up front again" (Tr. 728) in the post-February 1, 2006 period. Moreover, defendants' claim that this police activity was instigated by complaints received from residents about crime and disorder *in the park* is substantially undercut by the fact that the vehicle checkpoint was set up on Mamaroneck Avenue (across the street from where a large number of the day laborers were forced to gather), rather than in or adjacent to Columbus Park. Interestingly, the logs relating to the traffic checkpoint contain the heading "Day Laborer Detail" for the hours of 7 a.m. to 11 a.m. (Finding of Fact 55). It is easy enough to deduce who the targets of the enforcement activity were.

The evidence, viewed as a whole, makes it clear that the Village's claim that defendants' actions were driven by legitimate law enforcement concerns is a pretext dreamed up to try to legitimate its activity in opposition to the presence of day laborers. Ultimately, this conclusion rests on the clear contradiction between defendants' conclusory testimony that their campaign was not race-based and the hard facts, which indicate that it was. Defen-

dants' stated reason for conducting their ticketing campaign (the unprecedented influx of day laborers into Mamaroneck) was entirely specious, and the accusations they made concerning the anti-social conduct of the day laborers themselves have no support whatever in the record. Defendants' contemporaneous, public defense of their conduct is completely incredible, which undermines the credibility of their self-serving statements that "race had nothing to do with it." The fact that the attitude of these Village officials differs radically from the historical attitude of Village officials toward transient laborers makes the Village's testimonial claim that officials would have taken the same steps regardless of the race/ethnicity of the day laborers that much harder to believe.

For the above reasons, the court concludes that plaintiffs have made out their *Brown/Pyke* equal protection claim.

*B. Selective Treatment Based on Bad Faith Intent to Injure the Plaintiffs*

Under the *LeClair* "selective enforcement" branch of Equal Protection analysis, plaintiffs must show both selective treatment—that is, that they were treated differently from similarly situated individuals—and that such selective treatment was based on such impermissible considerations as a malicious or bad faith intent to injure the plaintiffs, a standard that can be satisfied simply by showing that defendants acted out of personal dislike of the plaintiffs. 627 F.2d 606, 609–10 (2d Cir.1980); *Bizzarro v. Miranda,* 394 F.3d 82, 87 (2d Cir.2005).

That the Village acted with malicious or bad faith intent to injure the day laborers is easily proven. The findings of fact recited above point unequivocally to that conclusion. The Village campaigned aggressively against the day laborers with the expressed intention of reducing their

numbers or forcing them out altogether. Thus, the mayor said in a televised address in the spring of 2006: "If I go back to about 16–18 months ago, we in the Village of Mamaroneck had an out of control problem in the Village where we had a vast number of laborers coming to our village seeking employment. We estimate the number to be somewhere around 220, and these laborers were in and around Columbus Park ..."

In response to this "out of control problem," the mayor and his fellow defendants came up with a plan to reduce the number of day laborers in the village through a campaign—again in the mayor's own words—of "aggressively ticketing the day laborers and the contractors who hire them." (Finding of Fact 154.) The mayor claimed to want the number of day laborers to return to its "historical" level, but the evidence does not demonstrate that the actual slightly larger number of day laborers who plied the streets of Mamaroneck during the 2004–2006 period was any more unmanageable, or created any more problems (other than the increased hostility of local residents and business people) than the slightly smaller number of day laborers who had gathered in the same location for many, many years. And as plaintiffs point out, a plan to drive out an entire class of persons in order to deal with a few miscreants raises serious constitutional issues.

There is thus no question, on this record, that the campaign of aggressive law enforcement instigated by the Village police in the Columbus Park area was aimed at and disproportionately affected Latino day laborers and the contractors who sought to hire them. There is no question that defendants were specifically scrutinizing the activities of the day laborers—who were repeatedly harassed by the police when they gathered in the Village—and the contractors who sought to hire them—who were the acknowledged victims of special law enforcement scrutiny. (Findings of Fact 47, 53, 63, 133, 155.)

The issue that requires extended discussion under this theory is whether the plaintiffs have demonstrated that the day laborers and the people who sought their services were treated differently from "similarly situated" individuals—the *sine qua non* of a *LeClair* "selective enforcement" violation.

Striving to keep the court's focus on the broad contours of defendants' discriminatory campaign, plaintiffs initially alleged that the "similarly situated" group under *LeClair* consists of "all other persons in Mamaroneck." (Pl. Br. at 31.) This contention borders on the ridiculous. In response, defendants insisted that the only group of people who could conceivably be "similarly situated" for *LeClair* purposes would be another large group of men who gathered in one place and stood around for a few hours—and further argued that no such group had been identified.

In a post-trial memorandum, the court asked plaintiffs to clarify what group or groups they allege to be "similarly situated" to them for purposes of their *LeClair* claim. Plaintiffs responded by arguing that "drivers of vehicles who were not seeking to employ day laborers" and "those who stood on the sidewalks of Mamaroneck for purposes other than to seek work" are similarly situated to the contractors who sought to hire day laborers and the day laborers themselves, respectively. (Pl. Post–Trial Memo at 2–3.) Defendants countered once again that, "There was no evidence presented of a similarly situated group gathering regularly on the sidewalks and streets of the Village to solicit work or for any purpose, or of a similarly situated group of contractors or other business people who drove in the Village, had other

business than picking up day laborers, violated the traffic laws and were not ticketed." (Def. Post–Trial Memo at 2.)

Insofar as plaintiffs allege that persons who were not trying to pick up day laborers were allowed to violate the traffic laws with impunity, there is some evidence to support the conclusion they proffer. Credible testimony showed that police stationed in the Columbus Park area aggressively ticketed contractors. (Finding of Facts 47 and 50.) Credible testimony also demonstrated that, during the seventeen-month period during which day laborers gathered at the Site, numerous traffic citations were issued to contractors, sometimes for nothing more than stopping to pick up a day laborer. (Finding of Fact 64.) Some contractors who attempted to enter the Site to hire day laborers would simply drive away after speaking with the police officers stationed there. (Finding of Fact 66.) In an unprecedented order, Chief Flynn specifically directed his subordinates that commercial vehicles that stopped in Columbus Park—i.e. vehicles picking up day laborers—should be brought to the harbor for extensive and time-consuming safety inspections.

By contrast, the evidence showed that approximately 25–30 children were being dropped off at Nana's Kids, a nearby day-care center, every morning between 6:30 and 8:30 (a window of time that overlapped with the "day laborer detail"). There is no evidence that any of the drivers dropping off children was ticketed or intimidated. The evidence also showed that village police did not strictly enforce, and sometimes ignored, traffic and parking infractions that occurred in other parts of the Village, or that were committed by persons other than drivers of commercial vehicles who entered the area where day laborers could be found. (Finding of Fact 68.) One store owner observed Latino drivers being ticketed outside his store for not wearing a seatbelt; but when police officers saw white drivers not wearing their seatbelts, they made a gesture to show that the drivers should buckle their seatbelts but did not ticket them. (*Id.*) Likewise vehicles stopping to pick up passengers in the Village or children at their schools are not given tickets, even if they block a lane of traffic when they stop. (Finding of Fact 158.)

Thus, some of the evidence supports the conclusion that contractors who sought to hire day laborers were selected for aggressive enforcement of vehicle and traffic laws, whereas drivers who did not seek to pick up day laborers both in the Columbus Park area and throughout Mamaroneck could commit similar violations with relative impunity.

However, the evidence does not support a finding that *every* driver other than contractors was given a free pass by Village law enforcement personnel. On the contrary, the evidence adduced at trial suggests that other drivers of commercial vehicles were ensnared in the Village's aggressive law enforcement activity. The Trustees' resolution making Van Ranst Place a "no-through trucks" street affected any and all drivers. (Finding of Fact 127.) Similarly defying the notion that only contractors were being ticketed is Trustee Murphy's testimony to the effect that the checkpoint established on Mamaroneck Ave. in mid-March 2006 stopped "every van and truck" that went through. (Finding of Fact 137). And while there is no evidence in the record conclusively establishing who was ticketed over the entire course of the Village's aggressive law enforcement campaign, the sheer number of tickets and citations issued belies the notion that only the relatively small number of contractors who entered the Village were being ticketed.

The evidence showed that, during the first month following the opening of the day laborer site, approximately 200 traffic tickets and citations were issued. (Findings of Fact 48–49.) Similarly, during March and April 2006, a period after the closing of the Site during which the day laborers moved to their final location on Mamaroneck Ave., the Village issued more than 400 tickets (or roughly 200 per month, or 50 per week) to vehicles in the Columbus Park vicinity between the hours of 7 a.m. and 11 a.m. Given the unequivocal testimony adduced at trial that the number of contractors seeking to pick up day laborers fell after the instigation of intensive law enforcement activity, from a peak of 12 to 15 contractors down to 2 or 3, it is mathematically improbable that only contractors were being ticketed over the entire course of the campaign even during the hours of the "day laborer detail."

Moreover, plaintiffs' figures demonstrate only that a large number of tickets were issued in the Columbus Park area between the hours of 7 a.m. and 11 a.m. While these numbers indisputably establish the intensiveness of the law enforcement campaign, they fail, on their own, to show its "selectivity." By this court's rough estimate (plaintiffs did not conduct the comparison themselves), no more tickets were issued during the 7 a.m. to 11 a.m. window, when contractors were most likely to be in the area, than were being issued to drivers at other times of the day. This relative parity is consistent with evidence showing that, after the closing of the day laborer Site, intensive law enforcement remained in the Columbus Park area throughout the day.

An oft-quoted passage from LeClair warns that selective enforcement claims are "lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply." 627 F.2d at 608. Yet if any bedrock principle controls in this elusive area, it is that "selective enforcement" claims require the plaintiff or his group alone to have been subjected to discriminatory treatment. Thus, any evidence that the adverse treatment alleged was not limited to the plaintiff or his group defeats the claim. Because the evidence showed that contractors were not the only victims of the aggressive law enforcement campaign, the plaintiffs' "selective enforcement" claim with respect to the harassment and ticketing of the contractors must fail.

It is worth underscoring the dispositive difference between the plaintiffs' Pyke claim, which sounds in racially discriminatory treatment, and their LeClair claim of "selective enforcement." For purposes of their Pyke claim, plaintiffs have established, beyond peradventure, that the intended target of the intensive, prolonged, and highly aggressive police activity in the Columbus Park area were the contractors who sought to hire day laborers (and, through them, the day laborers themselves). Mayor Trifiletti's own statements demonstrate as much. So does the fact that the police detail at the parking lot of Columbus Park ended each day at approximately 11 a.m. during its operation as the day laborer Site. Moreover, the evidence shows that no drivers of commercial vehicles outside the Columbus Park area were ever subjected to any similar targeted ticketing campaign, and that, on a number of occasions, drivers of non-commercial vehicles in the Columbus Park area were given a free pass while engaging in the very same activities that resulted in stops and tickets for commercial vehicles in the Columbus Park area (dropping off or picking up passengers, or committing minor vehicle and traffic violations).

While these findings support the conclusion that defendants committed a *Pyke* equal protection violation (intentionally discriminatory enforcement of facially neutral laws), they do not make out a "selective enforcement" claim because the wide net cast by defendants to achieve their discriminatory purpose ensnared other drivers as well. The fact that the aggressive ticketing of all commercial vehicles in the "enforcement zone" of Columbus Park was part and parcel of the campaign that was intentionally devised and carried out to intimidate contractors does not relieve plaintiff's of their burden of proving that contractors were selected for ticketing to the exclusion of all others.

This court is mindful of the reality that, unlike the typical target group in a "selective enforcement" case, contractors seeking to hire day laborers may not be distinguished by any readily observable characteristic; thus any campaign waged against them is likely to be overinclusive. Yet straining to fit the facts of this case into the *LeClair* framework would require an expansion of the "selective enforcement" rationale that is neither legally nor logically sustainable. The more sensible conclusion is that *LeClair* "selective enforcement" theory is simply not an appropriate vehicle for the vindication of plaintiffs' rights.

The plaintiffs' second assertion under the "selective enforcement" theory is that the day laborers themselves were treated differently from residents of Mamaroneck who stood on the sidewalks for purposes other than to seek work. This aspect of their *LeClair* claim fails for two reasons.

■ First, a "selective enforcement" claim requires the selective enforcement of some specified law, and the plaintiffs have not alleged the existence of any such law. Since plaintiffs have not pointed to an actual regulation, ordinance, or statute de-fendants are alleged to have selectively enforced against them, they cannot proceed under *LeClair*.

Second, while the record is replete with evidence of police harassment targeted against day laborers, (Finding of Fact 155), plaintiffs not proved the existence of any "similarly situated" group. The court could, of course, conjecture that if people stood on the sidewalks of Mamaroneck for several hours for purposes other than seeking work, they would not have been harassed. And I understand the difficulty of proving a negative. However, plaintiffs' failure to show a similarly situated group is fatal to this prong of their "selective enforcement" claim.

### C. Class of One: Intentionally Treated Differently Without Rational Basis

Plaintiffs likewise urge this court to find that they have proved an equal protection violation under the reasoning of the *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), and its progeny. This I cannot do.

■ To prove an *Olech* claim, plaintiffs must show that they were intentionally treated differently from others who are similarly situated to them and that there is no rational basis for the difference in treatment. In such a case, "The level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir.2005). The *Neilson* court explained that a heightened level of similarity was necessary to ensure that the difference in treatment between plaintiffs and others was not based on legitimate government policy or mistake.

Plaintiffs initially alleged, in conclusory fashion, that they were similarly situated to "all other persons in Mamaroneck" (Pl.

Br. at 37). Of course, "all other persons in Mamaroneck" is simply too broad a group to satisfy *Neilson*'s heightened level of similarity. But plaintiffs argue that defendants' unconscionable actions do not reflect any legitimate government policy and, since they were deliberately aimed at the day laborers and those who hired them, they could not have been the product of mistake. From this they appear to reason that they need not satisfy the heightened level of similarity requirement.

There is no question that defendants' actions are not based on any legitimate government policy—indeed, are based on wholly fabricated and unsupported claims—and were definitely not the product of any error. That there was no rational basis for the Village's actions toward the day laborers and those who sought to hire them is beyond cavil. The stated reasons—concern over crime and disorder and over the large influx of non-resident day laborers—are wholly unsupported by the facts, and so are not rational. *Cobb v. Pozzi*, 363 F.3d 89, 100 (2nd Cir.2004). Moreover, to the extent that the defendants were motivated by a desire to keep non-locals out, their actions were unconstitutional. *Shapiro v. Thompson*, 394 U.S. 618, 632, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Spencer v. Casavilla*, 903 F.2d 171, 175 (2d Cir.1990) (extending *Shapiro* to intrastate travel); *Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir.2003) (same).

Unfortunately for plaintiffs, the lack of any rational basis for defendants' behavior does not get them where they want to go, which is around the "heightened similarity" standard that they have not met. The Second Circuit in *Neilson* did not say that heightened similarity was a requirement except where plaintiffs could prove that the actions of public officials were not the product of either legitimate government policy or mistake. While those factors were the announced reason for the rule, there was no mention of any carve-out from the rule if those factors were absent.

In the absence of any highly comparable group of similarly situated persons who were treated differently from the plaintiffs, plaintiffs' *Olech*-based class of one (or five) claim must be dismissed.

### III. MUNICIPAL LIABILITY

#### 1. Liability

 A municipality can be held liable under 42 U.S.C. § 1983 where a policy, custom or practice caused the deprivation of the plaintiffs' constitutional rights. *See Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Actions "taken by persons whose activities reflect official policy . . . may constitute a custom or policy for § 1983 purposes." *Stein v. Janos*, 269 F.Supp.2d 256, 262 (S.D.N.Y.2003) (underscore in original). Here, the Village is liable for the acts of the Mayor, the Police Chief and the members of the Police Department.

The evidence is incontrovertible that the acts at issue in this case were done at the direction and under the control of Mayor Trifiletti and Chief Flynn. There can be no question that both of them are municipal policymakers for purposes of municipal liability.

 The issue of policymaking authority for purposes of *Monell* is one of state law. *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1349–49 (2d Cir.1994). Mayor Trifiletti has such authority. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 449 (2d Cir.1980) ("Surely the mayor is the one city official whose edicts and acts represent municipal policy, especially when he joins other high-ranking municipal officers in devising and

successfully implementing the plan."); *Rookard v. Health and Hosp. Corp.*, 710 F.2d 41, 45 n. 4 (2d Cir.1983) ("Mayors may be treated as policy makers without proof of their specific powers and responsibilities." (citing *Quinn* )); N.Y. Village Law § 4–400(1)(b) (McKinney 2006) ("It shall be the responsibility of the mayor . . . to provide for the enforcement of all laws, local laws, rules and regulations and to cause all violations thereof to be prosecuted."); N.Y. Village Law § 4–400(1)(e) (McKinney 2006) ("It shall be the responsibility of the mayor . . . to exercise supervision over the conduct of the police and other subordinate officers of the village.").

Chief Flynn, too, is a policymaker. As Chief of Police, Chief Flynn is the executive officer of the police force and vested with decision making authority regarding officer assignments. N.Y. Unconsol. Law § 5711–q(21) (McKinney 2006) ("The chief of police of such village shall be the executive officer of the police force. . . . He shall assign to duty the officers and members of the police force, and shall have the power to change such assignments . . . in his judgment. . . . ."). Chief Flynn confirmed this, in an e-mail exchange with Trustee Murphy, in which Chief Flynn explains that, as Chief of Police, he is responsible for "the day to day operations of the police department, including assignment to the posts and concentrations of policy activity. . . ." (DX6). In that e-mail, Chief Flynn also explained that the Columbus Park initiative was "ordered by the Board of Trustees" and that he "take[s] direction from the Mayor who [he] speak[s] to on a daily basis." *Id.* Chief Flynn, Mayor Trifiletti, and the Board of Trustees were all involved in the police activity surrounding the day laborers which is the subject matter of this suit. Each has final decision-making authority with respect to the contested police activity.

 Accordingly, the Village of Mamaroneck is liable for the equal protection violations under § 1983. See also *Skehan v. Kelly*, 2005 WL 1023206 at *10–11 (S.D.N.Y.2005) (finding Village of Mamaroneck could be liable based on allegations that "the Board knowingly ratified the actions of Defendant Flynn and by doing so established municipal policy."), *aff'd in part, rev'd in part, dismissed in part, Skehan v. Village of Mamaroneck*, 465 F.3d 96, 108–10 (2d Cir.2006) (declining to consider § 1983 issue on interlocutory appeal).

### 2. Equitable Relief

 Plaintiffs seek the imposition of an injunction to redress further equal protection violations. Unfortunately, their post-trial submission does not include a discussion of what sort of enforceable relief the court might fashion. The initial goal of plaintiffs and NDLON was the reopening of a day laborer hiring site. However, I know of no law that would compel the Village of Mamaroneck to create a hiring hall for temporary workers, and certainly not for any undocumented workers who might be among the day laborers. Plaintiffs have not yet specified the parameters of an appropriate injunction.

The parties are directed to submit briefs on the issue of remedy within ten days of the date of this decision. Plaintiffs should also submit their request for attorneys' fees within ten days. Defendants may file an opposition to the request for attorneys' fees within five days.[5]

---

5. The court could not fail to notice that the perpetrators of some of the discriminatory behavior that was the subject of this lawsuit— notably Trustee Angilletta and Mr. Fava— were recently defeated in their bids for reelection and election, respectively, to the Village Board. Whether this political development lends itself to a reopening of settlement dis-

This constitutes the decision and order of the Court

cussions remains to be seen, but the court would entertain a joint application to post- pone further briefing in favor of renewed dis- cussions.